JOHN C. FORD, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 3996-70.   Filed September 15, 1971.

---

John C. Ford, pro se.
*Allan D. Hill*, for the respondent.

DAWSON, *Judge:* This case was heard in Los Angeles by Commissioner Charles R. Johnston. We have adopted his findings of fact and conclusions.

Respondent determined a deficiency of $274 in petitioner's Federal income tax for the year 1967. At issue is whether petitioner is entitled to a deduction under section 162(a), I.R.C. 1954, and the regulations promulgated thereunder, for certain expenses incurred by him when he undertook a course of graduate study at the University of Oslo in Norway in the fall of 1967. The answer depends upon (1) whether he was engaged in the trade or business of teaching after June 1967 and (2) whether his studies in Norway were directly related to maintaining or improving his skills as a teacher of English, Spanish, and social studies.

FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

John C. Ford (herein called petitioner) was a resident of Los Angeles, Calif., when he filed his petition in this proceeding. His individual Federal income tax return for 1967 was filed with the Director, Office of International Operations, Washington, D.C.

Petitioner received a bachelor of arts degree with a major in social studies from Los Angeles State College in 1962. In order to receive a Standard Teaching Credential, he needed, in addition to his bachelor's degree, a master's degree in his field of teaching or 24 credit units of educational courses and a year and a half of student teaching subject to certain waivers. Persons who have only partially met the requirements for a Standard Teaching Credential established by the State Board of Education are issued provisional credentials. In 1963 petitioner completed the 24 credit units of educational courses required for a regular teaching certificate and taught under a provisional credential, dated December 19, 1963, and valid until June 30, 1964, as a substitute or part-time teacher at LaSalle Junior High School and Antioch Girl's School in Pasadena and at Catwell Senior High

School in Montebello and at Queen of Angels School in Los Angeles. The subjects taught by the petitioner in those schools were developmental reading or speed reading. Petitioner also taught as a substitute in 1963 at Downey Union High School District, Compton Union High School District, and Alhambra Union High School District.

In 1964, 1965, and 1966 petitioner continued teaching under provisional credentials as a 20-day substitute or replacement with the various Union high school districts mentioned and began teaching remedial English at an evening class at Pasadena City College. He also began a course of studies in 1964 in a graduate program leading to a Ph. D in anthropology at the University of California at Los Angeles, which he continued in 1965 and 1966.

In 1967, the petitioner, pursuant to a provisional credential authorizing him to teach history, English, or Spanish, was employed as a regular, full-time teacher by Compton Union High School District for the semester which began in January and ended in June 1967. In order to avoid being offered a contract to teach at Compton for the fall term of 1967, he moved with his personal effects from his apartment so that the school could not reach him to make such an offer. He continued to rent his apartment while concealing himself in another from the Compton administrative office until he went abroad. He was not employed as a teacher at Compton Union High School after June 1967.

In August 1967, petitioner traveled to Oslo, Norway, via New York and England. Upon his arrival in Oslo he took language courses, primarily Norwegian, under an extension program of the University of Oslo. He also applied at that time for appointment as a substitute elementary school teacher with the USDESEA, a dependents school operated by the Department of the Army. He was notified by the Department of the Army that, effective November 22, 1967, he was qualified to teach as a substitute teacher for elementary grades in the dependents school USDESEA at Oslo, Norway. He taught 1 day in December 1967 in that capacity. In December 1967, he registered at the University of Oslo under a program leading toward a Ph. D in the field of anthropology. After registering at the University of Oslo, petitioner took courses in language and culture, linguistic analysis, and preparatory logic arithmetic, the last being required as a condition to entrance as a full-fledged student.

In November or early December 1967 petitioner wrote the Alhambra Union High School District inquiring about openings in the language department and indicating a desire to return to teach there in the 1968–69 school year. He was informed by letter dated December 12, 1967, that his letter would serve as a renewal of his application in the Alhambra District even though at that time there were no openings

in the language department. He completed his studies at the University of Oslo in July 1968, and returned to the United States.

In September 1968, petitioner accepted employment as a regular teacher of English and social studies at San Gabriel High School. After teaching for 1 school year at San Gabriel, he received a Standard Teaching Credential in 1969.

On his 1967 Federal income tax return the petitioner claimed a deduction for the following education expenses which were disallowed by respondent:

| | |
|---|---:|
| Travel | $640 |
| Books and supplies | 200 |
| Food and lodging | 500 |
| | 1,340 |

Petitioner was carrying on his trade or business of teaching in California and Norway in 1967. He traveled to Norway primarily to obtain further education, and his studies while there aided in maintaining and improving his skills as a classroom teacher of English, Spanish, and social studies.

### OPINION

At the outset we note that the regulations relating to educational expenses in effect during the taxable year 1967 were issued in 1958. In 1967 revised regulations were issued, and the respondent has since ruled that taxpayers may, with respect to taxable years beginning before January 1, 1968, rely on either the old or the new regulations. Rev. Rul. 68–191, 1968–1 C.B. 67. In his brief the petitioner appears to rely only on the 1967 regulations. We recognize his right to make the election. *Arthur M. Jungreis*, 55 T.C. 581, 587–588 (1970).

In late 1967 the petitioner began doctoral studies in linguistics and anthropology at the University of Oslo and he deducted on his Federal income tax return for that year the costs of travel, books and supplies, and meals and lodging, under the provisions of section 162(a),[1] claiming that they constituted ordinary and necessary business expenses. Respondent makes a three-pronged attack on the claimed expenses: (1) That petitioner was not actively carrying on his trade or business as a teacher when the expenses were incurred, but was unemployed; (2) that such expenditures were incurred by petitioner to meet the minimum educational requirements for qualification as a teacher, sec. 1.162–5(b)(2), Income Tax Regs.; and (3) that the courses taken

---

[1] SEC. 162. TRADE OR BUSINESS EXPENSES.

(a) IN GENERAL.—There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including—

\* \* \* \* \* \* \*

(2) traveling expenses (including amounts expended for meals and lodging other than amounts which are lavish or extravagant under the circumstances) while away from home in the pursuit of a trade or business; \* \* \*

by petitioner were not directly related to maintaining or improving skills required by him in his employment.

Respondent does not argue that the petitioner was not in the trade or business of teaching from 1963 until June 1967, while he taught under a provisional certificate. In June 1967, petitioner left his position as a teacher in the Compton Union High School District, and in August went to Norway. Respondent contends that in June 1967 the petitioner had voluntarily and indefinitely abandoned any active pursuit of the teaching profession.

Mere membership in a profession is not in itself the "carrying on" of a trade or business. *Peter G. Corbett*, 55 T.C. 884 (1971) ; *Henry G. Owen*, 23 T.C. 377 (1954). However, this petitioner has shown more than mere membership in the teaching profession after June 1967. Upon arriving in Oslo, he applied for appointment as a substitute teacher with USDESEA. Between November 22, 1967, when he received his appointment, and the end of 1967, petitioner actually taught for 1 day and was available for substitute teaching at other times. In November or December he wrote to the Alhambra Union High School District seeking employment for the fall of 1968. And, in September 1968, he did in fact return to California to teach English and social studies at San Gabriel High School.

In *Furner* v. *Commissioner*, 393 F. 2d 292 (C.A. 7, 1968), reversing 47 T.C. 165 (1966), the taxpayer did not cease to be a teacher during the 1-year period when she attended graduate school full time in order to improve her skills as a teacher. To that limited extent the respondent has indicated that he will follow the decision of the Court of Appeals. Rev. Rul. 68–591, 1968–2 C.B. 73. Upon further consideration, we too agree with the views expressed by the Court of Appeals in *Furner*. We will follow the reversal. In the instant case petitioner attended school for 1 year, taking courses which we think were directly related to improving his skills as a teacher of English, social studies, and Spanish. He falls within the scope of the *Furner* case. Moreover, his brief relationship with USDESEA is at least some additional evidence of his continuing active participation in the teaching profession. See and compare *Harold Haft*, 40 T.C. 2 (1963), where we recognized that a person can still be engaged in a trade or business though temporarily unemployed. Accordingly, we hold under these circumstances that the petitioner was engaged in the trade or business of being a teacher throughout the year 1967.

Respondent next argues that the petitioner took his doctoral studies at the University of Oslo for the purpose of meeting the minimum educational requirements for qualification as a secondary school teacher in California. We disagree. By 1963 petitioner had completed the 24 units of required educational courses. To be entitled to a Standard Teaching Credential petitioner needed only to fullfill certain student-

teaching requirements, either by 5 semester hours of student-teaching courses, or by 1½ year of full-time teaching. Petitioner in fact completed the full-time teaching requirement in 1968 and 1969. It is thus clear that his studies in Oslo were not necessary to meet the minimum educational requirements for qualification as a teacher. Respondent's position that the courses could have led to a doctorate degree, which also would have entitled petitioner to a Standard Teaching Credential, is without merit. Petitioner did not complete the doctorate program, and it is doubtful that a Ph. D. in anthropology would have been a "higher degree in a subject area commonly taught in public high schools." We think the petitioner's situation is akin to example (1), situation 2, of section 1.162–5(b)(2)(iii), Income Tax Regs. Nor were the courses taken at Oslo a part of a program leading to the qualification of the petitioner in a new trade or business. As a substitute teacher he performed the same duties as a regular teacher. There was no change of duties when his teaching credential changed from provisional to standard. As pointed out in section 1.162–5(b)(3)(i), Income Tax Regs., "all teaching and related duties shall be considered to involve the same general type of work."

At the University of Oslo petitioner studied Norwegian, language and culture, linguistic analysis, and preparatory logic arithmetic. In California he had taught remedial English and developmental reading. In addition, he was authorized to teach English, Spanish, and history. Upon his return to California in 1968 he taught English and social studies. Respondent argues that the courses which petitioner studied at the University of Oslo did not directly maintain or improve his skills in teaching English and reading courses. Again we disagree. Section 162(a) allows a deduction for all the "ordinary and necessary" expenses paid or incurred in carrying on any trade or business. The Supreme Court has stressed the accepted rule of the popular and regular import of the statute's words and emphasized that "ordinary" in this statutory context has "the connotation of normal, usual and customary." See *Deputy* v. *DuPont*, 308 U.S. 488, 495 (1940). Justice Cardozo, in *Welch* v. *Helvering*, 290 U.S. 111, 113–115 (1933), expressed the meaning of "ordinary" in the following manner:

Now, what is ordinary, though there must always be a strain of constancy within it, is none the less a variable affected by time and place and circumstance. Ordinary in this context does not mean that the payments must be habitual or normal in the sense that the taxpayer will have to make them often. * * * Here, indeed, as so often in other branches of the law, the decisive distinctions are those of degree and not of kind. One struggles in vain for any verbal formula that will supply a ready touchstone. The standard set up by the statute is not a rule of law; it is rather a way of life. Life in all its fullness must supply the answer to the riddle.

And in *Cosimo A. Carlucci*, 37 T.C. 695, 700 (1962), we recognized that a deduction for education should be allowed "if it is customary

for other established members of the taxpayer's trade or business to undertake such education." See also *David J. Primuth*, 54 T.C. 374 (1970). In our judgment graduate study by a teacher is perfectly "normal, usual and customary." As the Court of Appeals said in *Furner* v. *Commissioner, supra* at 294:

> it is not unusual, and is becoming more usual, for teachers to enroll in full time graduate study for an academic year in order to keep up with expanding knowledge and improve their understanding of the subjects they teach. It also appears, as is common knowledge, that many school systems require teachers to earn additional academic credits from time to time.

\* \* \* \* \* \* \*

Given these facts, a year of graduate study under the circumstances disclosed here is as much a normal incident of carrying on the business of teaching as study during vacation periods.

To be sure, professional educators act on the assumption that further education in their fields of expertise maintains or improves their ability to use their knowledge effectively and readily in the execution and performance of their duties.

The word "necessary," as used by Congress, has been construed to mean "appropriate" or "helpful" rather than "indispensable" or "required." *Blackmer* v. *Commissioner*, 70 F. 2d 255 (C.A. 2, 1934). It is our view that the petitioner's program of graduate study in anthropology and linguistics was appropriate and helpful, and did in fact improve his skills in teaching English, social studies, and Spanish. From the very nature of the courses petitioner took—anthropology,[2] language and culture,[3] and linguistics [4]—it is quite apparent that there was more than a remote relationship between the courses and his work

---

[2] The subject of anthropology includes physical and cultural anthropology. Cultural anthropology is defined by Webster's Third New International Dictionary (unabridged) as: "The division of anthropology that deals with the study of culture in all its aspects and that utilizes the methods, concepts, and data of archaeology, ethnology and ethnography, folklore and linguistics, and sometimes those of the sociological and psychological sciences."

[3] Culture is defined in Webster's Third New International Dictionary (unabridged) as: "The total pattern of human behavior and its products embodied in thought, speech, action, and artifacts and dependent upon man's capacity for learning and transmitting knowledge to succeeding generations through the use of tools, language, and systems of abstract thought."

[4] 14 Ency. Britannica p. 163, defines linguistics as follows: "Linguistics is the science devoted to the study of language and languages in all their aspects—their structure, their interrelationship with the rest of human activity, their history and mutual relations. It is an analytical science, resembling mathematics in many of its procedures, and can be called a "natural science" because it deals with the observation of discreet behavior events. It is a social science, a branch of anthropology, in that it examines a part of human behavior and the relation of language to the totality of human culture. It also deals with and impinges upon the humanities, taking its source materials partly from literary and other artistic creations, and studying history as well as contemporary activity.

"Linguistics as a scientific discipline can be treated in terms of the following topics: history and development of the subject from antiquity to modern times in various parts of the world; analytical methods and procedures for the study of the sounds and forms of language; relationships of languages; application to problems of pedagogy and education in general; model and example of the study of human behavior as a whole, including human history."

as a language and social studies teacher. We are persuaded that there was indeed a direct and substantial relationship. In this era of modern educational techniques, linguistic analysis, and cultural anthropology are certainly relevant to the teaching of all languages. These subjects are presently included in the curriculum of most accredited universities and colleges in this country and abroad. It cannot be seriously disputed in these times of progressive education and broadening quest for knowledge that linguistics and cultural anthropology improve the skills of a language and history teacher. No doubt the further knowledge acquired by petitioner enabled him to present his course material to his students with added meaningfulness; no doubt it helped to improve the caliber of his instruction; no doubt it made him a better teacher. Hence, we have no hesitation in holding that the expenses incurred by this petitioner were "ordinary and necessary" within the purview of the statute and the regulations. The education undertaken by him at the University of Oslo improved the skills required in his employment as a classroom teacher. The lesson of the regulations, which clearly favors teachers, seems to be that, at least within broad subject-matter classifications (such as sciences and languages or sciences and humanities), a classroom teacher is a classroom teacher. Consequently, expenses of education, which directly maintain or improve skills in any of a variety of classroom subjects, are deductible. See sec. 1.162–5(b)(3), Income Tax Regs., and cf. *Hill* v. *Commissioner*, 181 F. 2d 906 (C.A. 4, 1950). Here the expenditures for books and supplies are deductible under section 162(a). In view of our factual finding that the petitioner traveled away from his home in Los Angeles to Oslo *primarily to obtain education*, it follows that his expenditures for travel, meals, and lodging are deductible under section 162(a)(2). See section 1.162–5(d) and (e), Income Tax Regs., relating to travel as a form of education and travel away from home. See also *Brooks* v. *Commissioner*, 274 F. 2d 96 (C.A. 9, 1959); and *Coughlin* v. *Commissioner*, 203 F. 2d 307 (C.A. 2, 1954). It is inconsequential that the petitioner chose to acquire the additional education to improve his skills by attending a university in a foreign country rather than one in the United States.

Accordingly, we think that with respect to these factual issues it would be wrong to disallow the claimed deduction of this petitioner. Hence we reverse respondent's determination.

Reviewed by the Court.

*Decision will be entered for the petitioner.*

---

DRENNEN, *J.*, dissenting: I respectfully dissent.

First, I doubt that petitioner should be considered to be "carrying on" the business of teaching in 1967. He taught school as a substitute

or replacement teacher under a provisional credential at various places in 1964, and continued to do so during 1965 and 1966 while he was apparently working to obtain a Ph. D. degree in anthropology. Had he seriously intended to qualify as a regular teacher it seems that he could have become qualified as such prior to 1967. It would appear that he was primarily interested and involved in obtaining a Ph. D. degree during this period and used substitute teaching as a means of earning spending money. The same situation existed throughout his sojourn in Oslo. I do not believe petitioner's application for appointment as a substitute teacher after he arrived in Norway, and his 1 day of actual teaching, changed his status from that of mere membership in the teaching profession (if he had that) to "carrying on" the business of teaching, as the majority opinion implies. Of course, if petitioner was not in the business of teaching before he went to Norway, this would distinguish this case from *Furner* v. *Commissioner*, 393 F. 2d 292, reversing 47 T.C. 165, on which the majority rely.

Second, this opinion appears to stand for the proposition that once a person has taught school he becomes a professional teacher and thereafter can deduct all of the expenses of the type involved here, which would be nondeductible personal expenses to anyone else, which he incurs in seeking further education, regardless of the relationship of the courses taken to the subjects he has been teaching and regardless of where he chooses to sojourn and study. I would not give the regulation such a broad interpretation.

I find nothing to indicate that petitioner went to Norway to increase his skills as a teacher. It appears more likely that he went there because he wanted to study in Norway and continue work on this Ph. D. in anthropology, which, I assume, would qualify him for a new trade or business, that of being an anthropologist. It appears that in December of 1967 petitioner registered at the University of Oslo under a program leading toward a Ph. D. in anthropology, and presumably the courses he took thereafter were under that program. The majority recognize that a Ph. D. in anthropology would not have been a higher degree in a subject commonly taught in public high schools. This being so I find it difficult to understand how the subjects taken under that program can be considered to have been taken for the improvement of his skills as a public school teacher, except incidentally.

I also doubt that it can be considered "customary" for public school teachers to take a year off for study in a foreign country, particularly where such course of study has only at most a tangential relationship to their teaching duties; thus, it would not be an "ordinary" expense within the definition relied upon. Cf. *Welch* v. *Helvering*, 290 U.S. 111. And how far can we stretch the word "necessary" to include anything that is "appropriate" or "helpful." I daresay that the studies

undertaken by petitioner in Norway could be said to be "appropriate" and "helpful" in a sense to other people engaged in a variety of endeavors, as well as to petitioner, without qualifying the expenses incurred as ordinary and necessary business expenses.

RAUM, ATKINS, TANNENWALD, SIMPSON, and FEATHERSTON, *JJ.*, agree with this dissent.

_____

TANNENWALD, *J.*, dissenting: In my view, the majority has stretched the record beyond reasonable limits, particularly in light of the fact that the petitioner has the burden of proof. Their decision rests on a foundation that is highly questionable in several respects.

Although petitioner was engaged in various teaching activities during the years 1963 through 1966, he was also pursuing a continuous course of postgraduate study immediately following the completion of a bachelor of arts program in 1962. Thus in 1963, he completed the units of educational courses required for a regular teaching certificate and in 1964 embarked upon a *full-time* day program of study leading to a Ph. D. in anthropology. His teaching activities during this period were substitute, part-time assignments and an evening class in remedial English. The record is devoid of any evidence indicating how much time he devoted to these activities as compared with his studies. On the basis of the foregoing, it seems reasonable to conclude that, at least until December 31, 1966, petitioner was working to study, not studying to work. See *Arthur M. Jungreis*, 55 T.C. 581, 593 (1970). In any event, petitioner has not proved otherwise.

In 1967, petitioner stopped studying and became a full-time teacher. However, a bare 8 months later, he went to Oslo, Norway, apparently to complete his Ph. D. program in anthropology.[1] I think that it is open to question whether petitioner's brief venture into full-time teaching was enough to change his life style from that of a student to that of a teacher for the purposes of this case.[2] In this respect, this case is clearly distinguishable from *Furner* v. *Commissioner*, 393 F. 2d 292 (C.A. 7, 1968), reversing 47 T.C. 165 (1966). Nevertheless, for the purposes of analysis, I will accept the majority's conclusion that such a change took place.

_____

[1] The word "apparently" is used advisedly. All the record reveals is that petitioner went to Oslo and that he studied Norwegian and, later, other courses which were part of his Ph. D. program. Petitioner did not explain in any way why he went to Norway. On this basis alone, the portion of petitioner's deduction attributable to his actual traveling expenses could be disallowed on grounds of failure of proof. See sec. 1.162–5 (e) (1), Income Tax Regs., which retains the primary-purpose test with regard to expenses of travel away from home to obtain education.

[2] In *Albert O. Ruehmann III*, T.C. Memo. 1971–157, we considered a lawyer who took graduate study immediately after graduating from law school to be engaged in a trade or business. However, the ultimate decision turned on a concession by the respondent that, if we found the taxpayer to have been engaged in a trade or business *to any degree*, the educational expenses were properly deductible. Compare *Barry Reisine*, T.C. Memo. 1970–310.

Obviously, a person may be sufficiently established in a trade or business to permit the deduction of certain items of expenses (for example, teaching materials required by a teacher). But it does not follow that such a person should be entitled to deduct every expense that somehow can be connected with that trade or business. The requirement of section 162(a) that the expense be "ordinary and necessary" demands that the issue of deductibility be resolved in terms of the degree of relationship between the item and the trade or business.

The "necessary" requirement of section 162(a) has been construed to mean "appropriate and helpful." See *Welch* v. *Helvering*, 290 U.S. 111, 113 (1933); *Cosimo A. Carlucci*, 37 T.C. 695, 699 (1962). Although the question is, in my opinion, not entirely free from doubt, the broad scope of respondent's regulations, insofar as improvement of skills is concerned, dictate that I should accept the finding of the majority that the nexus herein is sufficient to satisfy this requirement.

But section 162(a) also requires that the expense be "ordinary" and, to me, the focus of this case should be on that word. The Supreme Court has stressed the accepted rule of the "popular or perceived import" of a statute's words and has further emphasized that "Ordinary has the connotation of normal, usual, or customary" and that each case "turns on its special facts." See *Deputy* v. *DuPont*, 308 U.S. 488, 493, 495–496 (1940). See also *Old Colony R. Co.* v. *Commissioner*, 284 U.S. 552, 561 (1932). And in *Cosimo A. Carlucci, supra,* we recognized that a deduction for education should be allowed "if it is customary for other established members of the taxpayer's trade or business to undertake such education." See 37 T.C. at 700. This concept is further reflected in our decision in *David J. Primuth*, 54 T.C. 374 (1970), where we held that employment agency fees paid by a corporate financial executive to obtain a similar position with a new employer were deductible. Applying this concept, I find it impossible to conclude that any of petitioner's expenses herein should be allowed as deductions.

In our society, it is customary for professional people to pursue educational programs to keep abreast of current developments which improve professional skills. Expenses of such continuing education should, under normal circumstances, be considered "ordinary." On the other hand, our society recognizes that the expenses of *preparing* oneself for his life's business are personal. Such expenses should not be considered "ordinary" expenses of the business in which he ultimately is engaged. In this case, the critical question is in which category the expenditures involved fall. In my opinion, the petitioner was merely pursuing, albeit with an interruption, the securing of his doctoral degree, as part of an ongoing program *designed to establish*

*him* as a teacher and, for the purposes of section 162(a), his expenditures should not be considered as "ordinary" expenses of an *established* teacher.

In this case, it appears that, in 1967, which is the only year before us, petitioner merely took courses in Norwegian in order to "do my homework before I got involved in the university situation." Whatever may be the circumstances in other cases with regard to the need for preparatory courses in foreign languages, I do not think it can be considered "normal, usual or customary" for a teacher with so little experience to travel to a foreign country and spend 4 months learning the language in order to take a mere 8 months of courses purportedly related to his trade or business. Even if I were to resolve this question in petitioner's favor and look only to the subsequent courses which he took, I would conclude that it was not "normal, usual or customary" for any teacher, in practice for such a short period of time, to embark upon a full-time course of study in a foreign country. In so stating, I do not mean to suggest that the foreign country aspect is necessarily determinative against a deduction. I can conceive of situations where study abroad would clearly satisfy the "ordinary" requirement of section 162(a). But such aspect is but one element to be taken into account and, since travel has an inherently personal aura, I think it is incumbent upon a taxpayer to give some reasonable explanation why the education in question needs to be undertaken so far from home base. Petitioner herein has furnished no such explanation and common knowledge cannot supply it on the basis of the record before us.

The majority relies heavily on the case of *Furner* v. *Commissioner*, *supra*, as support for the proposition that a taxpayer may still be in the business of teaching despite a 1 year's absence from any income-producing activity. That may well be so, but *Furner* does not stand for the proposition that, once in a trade or business, any expenses subsequently incurred for education which improves or maintains one's teaching skills are ipso facto deductible. In *Furner*, the taxpayer was a full-time teacher for 3 years before taking graduate courses for 1 year in history, the subject she had taught during that time. The Court of Appeals found that, under the circumstances, it was "not unusual, and is becoming more usual, for teachers to enroll in full-time graduate study for an academic year in order to keep up with expanding knowledge and improve their understanding of the subjects they teach." *Furner* v. *Commissioner*, 393 F. 2d at 294. That same conclusion does not hold in the instant case.

I think that at most petitioner's Norwegian sojourn might be said to represent an *abandonment* of his teaching status coupled with

an intention to *resume* the practice of his profession at a later date. On this basis, his expenses are not deductible. *Canter* v. *United States*, 354 F. 2d 352 (Ct. Cl. 1965); *Henry G. Owen*, 23 T.C. 377 (1954). See *Nathaniel A. Denman*, 48 T.C. 439, 445 (1967); *T. F. Driscoll*, 4 B.T.A. 1008 (1926).

We should not overlook the fact that we are dealing with a broad statute, providing for the deduction of ordinary and necessary business expenses, and not a specific provision reflecting legislative policy in the area of educational expenses. This is particularly the case in light of the specific provision denying a deduction for personal expenses. Sec. 262.

Educational expenses are not deductible if they are in fact personal expenses. Respondent's regulations recognize that the delineation of deductible educational expenditures in section 1.162–5, Income Tax Regs., is still subject to the "ordinary and necessary" language contained in section 162 and, unless that umbrella statutory test is met, the expenditures will be considered personal and nondeductible. See sec. 1.262–1(b)(9), Income Tax Regs. Compare *Bingler* v. *Johnson*, 394 U.S. 741, 749 (1969), quoting with approval *Elmer L. Reese, Jr.*, 45 T.C. 407, 413 (1966), affirmed per curiam 373 F. 2d 742 (C.A. 4, 1967). Perhaps respondent's regulations are not as clear as they might be in delineating the overall precondition that must first be met in order for section 162(a) to apply. Moreover, it is arguable that respondent's regulations exhibit a favoritism toward the teaching profession which borders on discrimination. But neither an acceptance of such discrimination nor the possible inadequacy of respondent's regulations can justify our refusal to follow the mandate of section 162(a) that the facts of a given case must show that the expense was "ordinary" to be deductible. In my opinion, petitioner herein fails to satisfy that test.

Drennen, Raum, and Simpson, *JJ.*, agree with this dissent.