EUGENE J. COLANGELO and HELEN L. COLANGELO, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Colangelo v. Commissioner
Docket No. 9991-76.
United States Tax Court
T.C. Memo 1980-543; 1980 Tax Ct. Memo LEXIS 40; 41 T.C.M. (CCH) 495; T.C.M. (RIA) 80543; December 8, 1980
*40 Held: The expenses incurred in 1973 by petitioner, a flight surgeon/aviation pathologist/aviation medical examiner employed by the U.S. Navy, in maintaining his proficiency as a private pilot are deductible under sec. 162(a), I.R.C. 1954, and the amplifying regulations, sec. 1.162-5, Income Tax Regs.
Joseph A. Gawrys, for the petitioners. Ronald P. Campbell, for the respondent. FORRESTER
MEMORANDUM FINDINGS OF FACT AND OPINION FORRESTER, Judge: Respondent has determined a deficiency *41 in petitioners' Federal income tax for the taxable year 1973 in the amount of $ 1,755.06. The sole issue for decision is whether petitioners are entitled to deduct a portion of the expense of operating their privately-owned airplane as a business-related education expense pursuant to section 162(a)[1] and section 1.162-5, Income Tax Regs.
FINDINGS OF FACT Some of the facts have been stipulated and are so found. Petitioners are husband and wife who resided in Virginia Beach, Virginia, at the time the petition herein was filed. They timely filed their joint Federal income tax return for 1973 with the Internal Revenue Service Center at Memphis, Tennessee. Helen L. Colangelo is a party to this proceeding solely by virtue of having filed a joint income tax return with her husband; consequently, Eugene J. Colangelo will hereinafter be referred to as petitioner. Petitioner is, and has been since the 1950's, a licensed physician. He joined the U.S. Navy in 1954 and has served in its flight *42 surgeon program since 1959. His qualifications and specialties include the designations flight surgeon, aviation pathologist, and aviation medical examiner. During 1973 petitioner held the rank of commander and was stationed at the Naval Safety Center at the Naval Air Station in Norfolk, Virginia. He was the head of the Pathology/Medical Accident Investigation Division, Life Science Department and the acting head of the Human Factors Division, Aviation Directorate. The focus of petitioner's duties was the analysis and prevention of aviation accidents throughout the Navy. For the period from April 1, 1972 to March 31, 1973, petitioner's superior Rear Admiral W. S. Nelson, Commander of the Naval Safety Center, made the following comments in a report on petitioner's fitness: CDR COLANGELO has continued his high level of innovative and meaningful contributions to the safety program but especially the aviation program wherein he is eminently qualified. During this reporting period he has directed his activities to three major areas of endeavor: 1. Reviewing and examining medical data at NAVSAFECEN. 2. Improving the quality and reliability of medical information being reported *43 to the Naval Safety Center. 3. Expanding liaison with commands that have common interests. As a result of DR COLANGELO's analyses of data at NAVSAFECEN and his participation in the autopsy studies resulting from accidents investigated by the NAVSAFECEN, the pathogenesis of a certain variety of fractures/dislocations of cervical vertebrae was established. This discovery provides a beginning basis for evaluating aviator's protective helmets by using medical laboratory methods and is currently being pursued. In an effort to improve the aviation medical information reported to the Center, DR COLANGELO has conducted training lectures for nearly all student flight surgeons in training at Pensacola during the past year. He has prepared and delivered lectures and informal seminars for flight surgeons and pathologists, treating the problem of identifying and reporting medical evidence in accident cases. Notable among these was his lecture at the Armed Forces Institute of Pathology's Aerospace Pathology Course. He has conducted numerous telephone consultations to medical officers who are conducting the medical aspects of aviation accident investigation using the opportunity to *44 serve as mentor as well as consultant. DR COLANGELO has developed a proposal for a Navy-wide program to improve the quality of medical investigations of accidents. In expanding liaison DR COLANGELO is currently serving as one of the two Navy members to the Joint Committee on Aviation Pathology (DOD), consultant to the Navy Surgeon General for Aviation Pathology, and is currently serving voluntarily as a flight surgeon for Fleet Tactical Support Squadron FORTY, providing the squadron with lectures and consultations in aeromedical problems. He participates in their training programs including inflight programs. DR COLANGELO submitted a research proposal through the Naval Aeromedical Research Laboratory, Pensacola, Florida to develop techniques in pathology to support accident investigation and to provide a reference laboratory to support the Safety Center's investigations. DR COLANGELO has pursued private training as a commercial pilot - single and multi-engine land planes. He is qualified in instruments and is certified as a flight instructor. He has more than 2,000 hours of pilot time. DR COLANGELO is of great value to my staff and is highly recommended for promotion. *45 The Manual of the Medical Department, U.S. Navy (hereinafter the "Manual"), discusses the primary purpose of flight surgeons as follows: 2-130.Flight Surgeons and Aerospace Medical Examiners (1) Flight surgeons and aerospace medical examiners assigned to aviation activities, in addition to their responsibilities as naval medical officers, have cognizance over the aeromedical considerations encountered within their units. They shall be specifically concerned with the physical fitness and welfare of all flying personnel, their aeromedical indoctrination in high altitude flight, the use of special personal airborne equipment, the ejection seat, night vision, and other physiological and psychological aspects of aviation. The Manual goes on to list several functions of flight surgeons. Among these, a flight surgeon shall-- associate himself with the immediate environment of the pilot as closely as possible. * * * be conversant with the flight characteristics of the aircraft assigned to his unit and should gain an understanding of individual pilot reactions to these aircraft. * * * Particular note must be made of the sum total of stresses to which flying personnel are subjected *46 during the course of a mission; such as, fatigue, noise and vibration, repeated changes of altitude, unfavorable weather, navigational difficulties, combat, and night carrier operations. * * * The flight surgeon shall maintain an active interest and participation in the flight saety program. The analysis of aircraft accidents from the standpoint of the humand factors involved shall be formulated by the flight surgeon and integrated with existing engineering data. The major emphasis, however, shall be on the prevention of accidents and the recognition of incipient unsafe conditions. Additionally, the Navy requires flight surgeons to be proficient in flying. Upon entry into the flight surgeon program each participant is required to engage in four to eight weeks of flight training. Subsequent to this initial training the Navy does supply flight surgeons with naval aircraft for use in maintaining their proficiency. Evidence at trialindicated that due to budgetary constraints the flight time provided to flight surgeons is wholly inadequate to allow them to remain proficient flyers. This is primarily due to the fact that flight surgeons have the lowest priority with respect to airplane *47 use. Furthermore, flight surgeons, not designated as naval aviators, may never be in sole command of any naval aircraft. In 1960 petitioner began taking additional flying lessons privately at his own expense. His motivation was to develop his skills and effectiveness as a flight surgeon. It was petitioner's experience that the more proficient he became as a flyer the more he observed the real environment and stresses placed upon a command pilot. The stress experienced by a command pilot would vary with such things as the nature of the mission, weather conditions, whether the flight is during the day or at night, and whether instrument navigation is required. In 1969 petitioner purchased a used 1965 Mooney Model M-20E "Super 21" Low-Wing, Retractable Gear, 4-Place Monoplane for $ 11,400 (hereinafter "Mooney"). The Mooney was equipped with options for high altitude flight requiring oxygen and a turbocharger, both added subsequent to its purchase by petitioner. Prior to, and during the entire year in issue, petitioner was licenced by the Federal Aviation Administration (hereinafter FAA) as a pilot with instrument rating, a commercial pilot with instrument rating, and a certified *48 flight instructor with instrument rating, for single and multi-engine aircraft. At the beginning of that year petitioner had logged a total of over 1,600 lifetime hours of pilot time. During 1973 petitioner logged approximately 490 hours of pilot time. 356 of which were in the Mooney. This included 88 hours of instruction given by petitioner for no charge [2] and 35 hours in military aircraft where petitioner handled the airplane's controls. The vast majority of instruction given by petitioner was in airplanes owned by others and not in the Mooney. Petitioner also was provided with approximately 10 hours' use of a multi-engine flight simulator by the Navy. Although the Navy does require flight surgeons to be able to fly, to the extent that they cannot maintain a safe level of skill by using military aircraft, it does not require them to maintain their pilot skills at their own expense. It does, however, encourage such action by flight surgeons. [3] The reasons for this are varied. First, a flight surgeon who is a qualified pilot, either Navy qualified or private, has an essential *49 rapport with the naval aviators. To be an effective naval aviator, and thus to stay alive, it is imperative that one heed the advice of his flight surgeon. According to expert testimony, it is much easier for naval aviators, who often have inflated egos, to relate to flight surgeons who have acquired a greater understanding through active participation in aero flight. Second, flight surgeons who are pilots are better qualified in accident prevention, petitioner's primary activity during 1973. Among other things, it adds much credibility to their recommendations. Another reason why the Navy encourages flight surgeons to be pilots is that they are more motivated to make careers out of flight surgery instead of going elsewhere for more prestigious clinical specialties. For example, petitioner is one of the only (if not the only) aviation pathologists that the Navy has been able to recruit since 1965. Proficiency as a pilot requires constant, regular flying experience *50 in control of the aircraft if that pilot is to maintain a reasonable level of safety. Pilot skills deteriorate rather rapidly when they go unused, even for periods of only a few weeks. Evidence at trial indicates a direct relationship between the length of time since the last flight and the risk of an accident. Evidence shows that a pilot with 160 hours of flying time during a 90-day period is 18 times safer than a pilot with less than 10 hours of flying time for that same period. The minimum amount of flight time required to maintain a reasonable level of safety is approximately 25 hours each and every month. This, however, refers to the time which the pilot is in command of the aircraft, not merely when he is a crewman. On his 1973 income tax return petitioner claimed 50 percent of the costs of operating and maintaining the Mooney during 1973--$ 5,267.52 [4] --as an educational expense. Sec. 1.162-5, Income Tax Regs. In his notice of deficiency respondent has disallowed this deduction in full. *51 OPINION Section 162(a) allows a deduction for all ordinary and necessary expenses of carrying on a trade or business, while deductions for personal expenses are expressly disallowed by section 262. Section 1.162-5, Income Tax Regs., governs the deductibility of a taxpayer's educational expenses for the year in issue. These regulations, as amended in 1967, set forth an objective test for deductibility. Weiler v. Commissioner, 54 T.C. 398, 402 (1970). They provide in pertinent part: Sec. 1.162-5(a). General rule. Expenditures made by an individual for education (including research undertaken as part of his educational program) which are not expenditures of a type described in paragraph (b)(2) or (3) of this section are deductible as ordinary and necessary business expenses (even though the education may lead to a degree) if the education-- (1) Maintains or improves skills required by the individual in his employment or other trade or business, *52 or (2) Meets the express requirements of the individual's employer, or the requirements of applicable law or regulations, imposed as a condition to the retention by the individual of an established employment relationship, status, or rate of compensation. (b) Nondeductible educational expenditures-- (1) In general. Educational expenditures described in subparagraphs (2) and (3) of this paragraph are personal expenditures or constitute an inseparable aggregate of personal and capital expenditures and, therefore, are not deductible as ordinary and necessary business expenses even though the education may maintain or improve skills required by the individual in his employment or other trade or business or may meet the express requirements of the individual's employer or of applicable law or regulations. (2) Minimum educational requirements. (i) The first category of nondeductible educational expenses within the scope of subparagraph (1) of this paragraph are expenditures made by an individual for education which is required of him in order to meet the minimum educational requirements *53 for qualification in his employment or other trade or business. * * * (3) Qualification for new trade or business. (i) The second category of nondeductible educational expenses within the scope of subparagraph (1) of this paragraph are expenditures made by an individual for education which is part of a program of study being pursued by him which will lead to qualifying him in a new trade or business. * * * (c) Deductible educational expenditures-- (1) Maintaining or improving skills. The deduction under the category of expenditures for education which maintains or improves skills required by the individual in his employment or other trade or business includes refresher courses or courses dealing with current developments as well as academic or vocational courses provided the expenditures for the courses are not within either category of nondeductible expenditures described in paragraph (b)(2) or (3) of this section. (2) Meeting requirements of employer. An individual is considered to have undertaken education in order to meet the express requirements of his employer, *54 or the requirements of applicable law or regulations, imposed as a condition to the retention by the taxpayer of his established employment relationship, status, or rate of compensation only if such requirements are imposed for a bona fide business purpose of the individual's employer. Only the minimum education necessary to the retention by the individual of his established employment relationship, status, or rate of compensation may be considered as undertaken to meet the express requirements of the taxpayer's employer. However, education in excess of such minimum education may qualify as education undertaken in order to maintain or improve the skills required by the taxpayer in his employment or other trade or business * * * Furthermore, the overall requirement of section 162(a), that the expense be "ordinary and necessary" in order to be deductible, must still be met. Ford v. Commissioner, 56 T.C. 1300, 1305-1307 (1971). Petitioner does not argue that flying in a private aircraft at his own expense is required by his employer, but only that flying maintains and improves skills required in his employment as a naval flight surgeon/aviation pathologist/aviation *55 medical examiner. It is his position, as a member of the aviation accident analysis team at the Naval Safety Center, that proficiency as a pilot is "an essential ingredient to the proper performance of his duties." Petitioner's contention is that 300 hours of pilot time per year, 25 hours per month, is essential to "maintain an appropriate level of skill in order to maintain a reasonable level of proficiency, consistent with safety, so that he, himself, will not become an accident statistic." [5] Petitioner does not appear to argue that 300 hours per year is required to know the immediate environment of a pilot and to know "the sum total of the stresses to which flying personnel are subjected." But he does contend that substantial flying as a command pilot is essential to this knowledge. It is his basic contention that he cannot safely fly as a command pilot at all unless he flys sufficient hours to make such flight safe. *56 Respondent, on the other hand, poses objections to the deductibility of these expenses on three grounds. First, respondent contends that petitioner's expenses are neither ordinary, necessary, nor reasonable. Next, respondent argues that petitioner's airplane expenses were not incurred to maintain or improve the skills required in petitioner's employment. Finally, respondent alleges that, notwithstanding our findings on the above arguments, the expenses incurred by petitioner in operating his Mooney aircraft during 1973 qualified him for a new trade or business subsequent to 1973, as a commercial pilot and instructor for hire. The burden to prove that respondent's determination is erroneous rests here with petitioner. Welch v. Helvering, 290 U.S. 111 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure.
The first issue to which we must address ourselves is whether or not petitioner's activities as a private pilot during 1973 led to qualifying him for a new trade or business. Sec. 1.162-5(b)(3), Income Tax Regs. If private flying in 1973 qualified petitioner for a new trade or business then even if it improved his skills *57 and was ordinary and necessary the expenses would be nondeductible. Sec. 1.162-5(c)(2), Income Tax Regs. Respondent alleges that petitioner embarked on an "overall comprehensive flying training program" extending over 13 years and involving 4,200 flying hours and evidneced by his "gradual and systematic acquisition of the necessary requirements and licenses from the FAA" and by his failure to enter the trade or business of commercial flying until he had acquired all of the necessary training and licenses subsequent to 1973. We find respondent's argument contrary to the evidence presented. Respondent and petitioner have stipulated that: "During the taxable year 1973, petitioner Eugene J. Colangelo was licensed by the * * * FAA as a pilot with instrument rating, a commercial pilot with instrument rating, and a certified flight instructor with instrument rating, for single and multi-engine aircraft." these are all of the flight certifications (licenses) which petitioner would need to be a pilot instructor for hire, and all that he has used as a flight instructor for remuneration since 1973. Thus, it is clear that petitioner had qualified for the trade or *58 business of flight instructor prior to 1973, and his flight training during 1973 did not "lead to qualifying him for a new trade or business." Sec. 1.162-5(b)(3)(i), Income Tax Regs.
Respondent makes much of the fact that petitioner did not instruct student pilots for money until after the year in issue. We find this fact largely irrelevant. Respondent's point would be well taken if petitioner had sought to deduct his flight training expenses because they maintain or improve his skills in the business of flight instructor--a business which, as of 1973, he had not yet entered. This, however, is not what petitioner maintains. He seeks the deduction because the expenses improved or maintained his skills as a flight surgeon/aviation pathologist/aviation medical examiner--his trade since 1959. Our primary concern is when petitioner became qualified to enter a new trade or business--before 1973--not when he chose to enter it--after 1973. For an education expense to be deductible under section 162 it must be both "ordinary" and "necessary." Sec. 162(a); Ford v. Commissioner, 56 T.C. 1300, 1305 (1971), *59 affd. 487 F. 2d 1025 (9th Cir. 1973). In this context "ordinary" has been defined as that which is "normal, usual and customary" in the taxpayer's trade or business. Deputy v. du Pont, 308 U.S. 488, 495 (1940); Carlucci v. Commissioner, 37 T.C. 695, 700 (1962); cf. Commissioner v. Tellier, 383 U.S. 687, 689 (1966). Testimony of both petitioner and Dr. Frank H. Austin, Jr., [6] showed that although most flight surgeons are not private pilots and do not own their own airplanes, many do fly as pilots and all are required to be able to fly. Furthermore, private flying by flight surgeons is encouraged by the Navy. On the basis of these factors we are of the opinion that private flying by flight surgeons is "normal, usual and customary." *60 "Necessary," as used in the statute, has been construed to mean "appropriate" or "helpful," not "indispensable" or "required." Blackmer v. Commissioner, 70 F. 2d 255 (2d Cir. 1934); Ford v. Commissioner, 56 T.C. 1300, 1306 (1971). Dr. Austin testified that, particularly for petitioner, flying is not only helpful, but important if not essential. He noted that it develops a needed rapport between a naval aviator and a flight surgeon. James K. Thompson, [7] a naval aviator for over 20 years, agreed with Dr. Austin. When asked if it was essential for flight surgeons to have a good rapport with the pilots to whom they ministered, Mr. Thomspon replied: *61 I think that's probably the most critical thing that a flight surgeon can be faced with. Pilots have a tremendous ego, particular the fighter and attack pilots in the Navy. And the flight surgeon-pilot relationship, I think, is most critical. If a flight surgeon is fortunate enough to be an aviator, this closes the gap. I would say that it makes him a full member of the club, and the rapport naturally is closer. Mr. Thompson proceeded to note that this would be true regardless whether the flight surgeon was a designated naval aviator or a private pilot. Dr. Austin also testified that as an aviation/pathologist and an aviation/medical examiner petitioner's status and experience as a private pilot was invaluable in his work in accident analysis and prevention at the Naval Safety Center. Petitioner sat on the accident investigation board (the board) with engineers, pilots and other technicians. He was a more effective member of the board since he could look beyond mere biomedical factors to psychologial, mechanical, and environmental factors as well. Again, Mr. Thompson, who has also sat on the board, concurred with Dr. Austin. He stressed that in every aviation accident *62 the pilot's perceptions, his physical and medical condition, and the plane's mechanical operation were interrelated factors that could not be separated. The more experience and knowledge one possessed of these different factors the more effective he would be. In light of the testimony of Dr. Austin and Mr. Thompson, two highly qualified and knowledgeable experts in their respective aviation specialties, on the benefits of being a pilot for a flight surgeon who is also an aviation/pathologist and aviation/medical examiner, we find that the expenses incurred by petitioner in the operation and maintenance of his Mooney airplane were helpful in his trade or business. Thus, petitioner has met the "ordinary" and the "necessary" requirements of section 162(a). The next question with which we must deal is whether petitioner's flying as a pilot in command during 1973 maintained or improved his skills as a flight surgeon/aviation pathologist/aviation medical examiner. It has been said that "the skills 'required' by the taxpayer in his employment of other trade or business are those which are appropriate, helpful or needed." Carlucci v. Commissioner,37 T.C. 695, 699 n. 6, *63 quoting Rev. Rul. 60-97, 1960-1 C.B. 69. [8] Although we do not believe that such a statement represents a rule of general application, we do consider it applicable in the instant case. We have found that upon the record presented flying is a skill required of petitioner by the Navy. He was required to be proficient and encouraged to fly privately. It is clear that petitioner's activities as a private pilot did maintain and improve this skill. Moreover, petitioner has proved that flying improved the more direct skills used in his occupation. It added essential rapport to his interaction with pilots. More importantly, it gave him great understanding and insights of what a pilot in command experiences in the cockpit of an aircraft. As an aviation pathologist, analyzing all of the factors which lead to and cause aviation mishaps, flying hones petitioner's ability to simultaneously draw from psychologial and mechanical concerns as well as biomedical science to form conclusions. This cannot be understated since the conclusions which petitioner reached from the analysis of aviation accidents formed the basis of his recommendations for future aviation accident prevention *64 designed to save both lives and money. To be deductible, however, the expenditure must be reasonable. See Commissioner v. Heininger, 320 U.S. 467, 471 (1943). Petitioner asks us to find that 25 hours of pilot time per month is reasonable. Each of petitioner's expert witnesses expressed opinions on how many hours of pilot time are required to maintain an appropriate level of skill consistent with reasonable safety. Dr. Austin estimated that, consistent with safety, petitioner would require a minimu of 120 house per year (possibly up to 220 hours). Mr. Thompson testified that studies completed at the Naval Safety Center indicate that between 24 and 28 hours of flight time per month is required for purposes of safety. He added that correspondence has indicated that these figures are in conformity with those of U.S. Army, the Coast Guard, and the Air Forces of Israel, West Germany, Canada, Australia, and Russia. Paul Newell Harmon, [9] a commercial airline pilot with approximately 12,000 flight hours, agreed with Mr. Thompson's estimate of 25 hours per month. A chart entered into *65 evidence from an accepted authoritative aviation publication showed that the accident rate per 100,000 flight hours is 50 percent greater for pilots who have flown only 25--60 hours in a 90-day period than for pilots who have flown 60--90 hours during a 90-day period. On the basis of all of the evidence presented, we find that it was reasonable for petitioner to fly 25 hours per month (300 hours per year) to maintain a level of proficiency consistent with safety. [10]
For the year in issue petitioner seeks to deduct only 50 percent of his out-of-pocket expenses of operating and maintaining the Mooney aircraft. This translates into approximately 178 flight hours during 1973. His total pilot hours in military and other aircraft not owned by him during that year amounted to approximately 120 hours. Deducting *66 this amount from the 300 hours needed to safely maintain his proficiency leaves approximately 180 hours of flight time petitioner reasonably flew incident to maintaining and improving the skills used in his trade or business. Accordingly, we hold that petitioner is entitled to deduct the full 50 percent of the expenditures incurred in the operation of his Mooney aircraft during 1973. We do not suggest that all flight surgeons who hold private pilot licenses and who command private aircraft may deduct the expenses thereof. Petitioner if truly a unique individual. In the words of Rear Admiral Nelson, Petitioner is "eminently qualified. in the naval aviation program. In addition to merely being a flight surgeon, he is a highly trained expert in the field of aviation pathology who specializes in accident analysis and prevention. During the 15 years prior to trial, petitioner was almost exclusively the only person in the Navy who had performed the duties of aviation pathologist. He was one of very few (if not the only) flight surgeons to serve two terms at the Naval Safety Center. His opinions on the accident review board were highly regarded due to his expertise and knowledge both *67 as an aviator and as a medical officer. Based on the foregoing, Decision will be entered for the petitioner. Footnotes
1. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable year in issue.↩
2. Subsequent to 1973 petitioner has received remuneration for his services as a pilot instructor.↩
3. The American Board of Preventative Medicine requires, as a prerequisite for certification as an aerospace medicine specialist, that the candidate engage in regular and frequent participation in aerial flight.↩
4. Petitioner does not include in this amount any depreciation on the aircraft. Thus, operating costs refer only to the actual out-of-pocket expenses of the petitioner. Furthermore, it is undisputed that the cost to rent a plane similar to the Mooney would have been in excess of petitioner's operating and maintenance costs actually incurred by owning such an airplane.↩
5. Petitioner did not deduct the expenses incurred in 300 hours of pilot time in the Mooney aircraft in 1973. The deduction claimed is 50 percent of his costs in the operation and maintenance of the airplane during 1973, e.g., the equivalent of all of the expenses of 178 hours of pilot time (50% of 356).↩
6. At the time of trial Dr. Austin was the Director of Medical Operations at NASA Space Center as flight surgeon for the astronauts and the space shuttle operations in Houston, Texas. He has served in the U.S. Navy for 32 years in various capacities, including, flight surgeon, naval aviator, test pilot, senior medical officer on the U.S.S. Enterprise Nuclear Carrier, and as Director of both Aeromedical Safety and Aviation Mdicine for the chief of naval operations at the Pentagon.↩
7. Thompson retired from the Navy as a Commander in 1978. He began in 1955 as a fighter pilot. He has flown 17 types of airplanes as a light attack, heavy attack, and reconnaissance attack pilot. Additionally, Mr. Thompson has served as a maintenance officer in squadrons, an operations' officer, an executive officer of reconnaissance squadrons, a command officer of reconnaissance squadrons, the head of operations and aircraft operation facilities division at the Naval Safety Center, and the head of the fighter attack analysis division at the Naval Safety Center.↩
8. See also Aaronson v. Commissioner, T.C. Memo. 1970-178↩.
9. At the time of trial Mr. Harmon was the chief pilot for Piedmont Aviation in their general aviation division. He is responsible for the charter and training divisions in Norfulk, Virginia. Mr. Harmon has been a pilot since 1939.↩
10. Compare Knudtson v. Commissioner, T.C. Memo. 1980-455; Shaw v. Commissioner, T.C. Memo. 1969-120↩.