WILLIAM G. DAUGHERTY and HELEN G. DAUGHERTY, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Daugherty v. Commissioner
Docket No. 17982-81
United States Tax Court
T.C. Memo 1983-188; 1983 Tax Ct. Memo LEXIS 602; 45 T.C.M. (CCH) 1224; T.C.M. (RIA) 83188; April 5, 1983. Sameul G. Brundage, for the petitioners. Michael Sheeley, for the respondent. COHEN
MEMORANDUM FINDINGS OF FACT AND OPINION COHEN, Judge: Respondent determined deficiencies in petitioners' taxes for 1976, 1977, and 1978 of $4,383, $5,853, and $8,141, respectively. The question presented is whether petitioners' farming activity with respect to those years was "an activity not engaged in for profit" within the meaning of section 183. [1]
FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. The stipulation of facts and accompanying *603 exhibits are incorporated herein by this reference. During the years in issue and at the time of the filing of the petition herein, petitioners William G. Daugherty and Helen G. Daugherty were married and resided in Chili, [2]New York. They timely filed joint Federal income tax returns for the years in issue with the Internal Revenue Service Center at Andover, Massachusetts. Helen Daugherty grew up on a farm but has not taken part in any of the farming activities involved in this case; hereinafter references to "petitioner" will be to William Daugherty. Petitioner was born in 1917 in Chili, which is a farming community in western New York State, and, except for a brief period of time while a young man, he has resided there his entire life. Petitioner's parents owned and operated the farm that is the subject of this dispute, and petitioner lived there and worked on the farm until he was 16 years old. His parents lost the farm to foreclosure in 1933. They subsequently rented another farm in the area, and petitioner worked there while also working as an attendant in a gasoline station. At age 18 he began working in a *604 screw machine shope and ultimately became factory supervisor. After that business was sold, petitioner worked briefly elsewhere, and he and an associate began acquiring used screw machines. In 1953, they opened Advanced Screw Products Corp. ("the corporation"). Shortly thereafter petitioner became the sole owner of the corporation. The corporation prospered and by the early 1970's employed approximately 45 persons. Petitioner was spending less time on the floor working with the machines and more time in the office doing administrative work. He started planning for selling the corporation to his employees and retiring. In 1973, Robert Stryker, who lived near the subject farm, learned that it was for sale and approached petitioner and suggested that he buy it; Stryker knew petitioner had lived on the farm as a child. After personally inspecting the soundness of the structures and land, petitioner, in June 1973, bought the property with the intention of leasing it to others to farm. He did not purchase it to realize appreciation in value. [3] Petitioner paid $79,249.38 for the land and improvements; no equipment was included in the sale. Located on the land was a 150-year-old *605 house, two barns, a tool shed, a pig house, a chicken house, and a crop of hay. There were no recreational facilities. Petitioner knew there was a ready market for hay, which is relatively inexpensive to raise and market. That first year petitioner sold the crop, unharvested, to a farmer, Mr. Ehrmentrout, for $600. He rented the house to one of his three daughters for $200 a month plus utilities, a price in line with comparable rentals in the area. His daughter also rented 40 acres from petitioner, only 23 of which were tillable, and a portion of a barn, for $25 a month. The following year petitioner contacted Mr. Ehrmentrout to sell him the current year's crop, but he declined to purchase it. After trying unsuccessfully to get another farmer to operate the farm, petitioner decided it would be necessary for him to farm the land himself. He bought the equipment needed to harvest the hay, took time off from Advanced Screw Products, spent 8 to 10 hours a day on the farm, and harvested and sold the crop himself. During the off-season he was often on the farm clearing land and performing maintenance duties. Thereafter, he farmed the *606 land by taking the necessary time off from the corporation and spending the entire day at the farm during the harvest. In general, hay farming requires less time and attention than raising other crops or livestock because a seedbed will normally produce hay for 5 years, and constant attention to the crop is required only at harvest time. Local teenagers provide the necessary "muscle," and there are ready buyers who pick up their purchases. Because hay farming is relatively inexpensive and hay is easy to raise and market, a vast majority of the farmers in the Chili area grow some hay. In March 1977, petitioner sold Advanced Screw Products for a current payment of $50,000 and installment payments of $48,000 per year for the next 10 years. During the taxable years 1975 through 1981, [4] petitioner had nonfarm income in the following amounts: 1975
$51,750
1976
53,755
1977
81,552
1978
55,435
1979
53,272
1980
62,767
1981
58,555
Although petitioner did not receive any wages from Advanced Screw Products after 1977, beginning in 1977 he did receive $10,000 per year (prorated *607 for 1977) pursuant to a noncompetition agreement with the corporation that was in effect at least through 1981, and in 1979 and 1980 he was also paid a management fee of $10,000. Petitioner's income from sources other than Advanced Screw Products during these years was insignificant. Since acquiring the farm, the number of acres under cultivation by petitioner, the per acre yield, and the price received for the hay have been as follows: Yield/Acre
Price
Year
No. of Acres
(Tons)
Per Ton
1973
30
*
*
1974
30
3.1
$35
1975
30
1.3
50
1976
30
2.1
50
1977
30
1.7
57
1978
30
1
60
1979
30
1.6
45
1980
36 **
1.2
50
1981
36 **
2
55
Petitioner kept detailed records of his farming activities in a ledger manufactured for that purpose and purchased by petitioner in a stationery store. He used a single checkbook for the payment of both farming and personal expenses. The rental activities relative to the farm were consolidated on the records *608 with the farming activities. Petitioner has also on occasion subcontracted equipment and labor in connection with the cutting of hay for other farmers in the area; the income and expenses of that operation were also incorporated into the financial records of the farm. He reported the following gross revenue, total expenses, gross profit or loss, depreciation, and net profit or loss on the Schedule F filed with their returns for 1973 through 1981: Taxable
Gross
Total
Gross Profit
Net Profit
Year
Revenue
Expenses
or (Loss)
Depreciation
or (Loss)
1973
$1,725
$4,322
($2,597)
$3,608
($6,205)
1974
6,042
7,652
( 1,610)
6,789
( 8,399)
1975
4,505
6,652
( 2,147)
5,259
( 7,406)
1976
8,110
8,486
( 376)
6,558
( 6,934)
1977
6,692
8,703
( 2,011)
8,191
(10,202)
1978
3,908
8,653
( 4,745)
12,030
(16,775)
1979
4,300
8,463
( 4,163)
13,002
(17,165)
1980
4,683
7,279
( 2,596)
12,825
(15,421)
1981
3,604
10,590
( 6,986)
10,294
(17,280)
Petitioner's expenditures for improvements and repairs to the house alone during 1973 through 1981 totaled approximately $21,000, and included plumbing, electric, furnace, insulation, *609 and siding work as well as paint and wallpaper work. Petitioner spent approximately $82,000 on farm equipment between 1973 and 1979, primarily for haying equipment, tractors, and trucks. The major pieces of farming machinery, with proper care, can be operated for up to 30 years. Petitioner utilized the straight-line method of depreciation for both the house and the equipment, assigning a 25-year life to the house and a 7-year life to the equipment. Petitioner suffered full and partial losses of the seedbed in the years and for the reasons set forth below: 1978 - New seed bed washed out by heavy spring rains. 1979 - Fragile new fields were destroyed by extremely cold weather. 1980 - Crop failed to revive after 1979 freeze-out. 1981 - Damaged crop area replanted with corn for weed control and soil revitalization. Petitioner did not plant either a ground cover or a nurse crop. Ground cover could not be planted because of insufficient open space. Although a nurse crop would have helped prevent soil erosion, it is common for hay farmers not to plant one because additional equipment is needed to harvest it. In 1978, petitioner, along with a partner, acquired an additional *610 100 acres near the subject farm to provide more tillable land to make his farming operations more profitable. In addition, the land he was renting to his daughter reverted to him in 1982. Also in 1982, petitioner introduced "no-till" planting, a new technique recommended by soil conservationists, on his farm. Petitioner joined the Farm Bureau and reads the literature distributed by it, along with farming materials issued by various governmental bodies and seed and herbicide companies. He personally performed or supervised all the farm-related work done on the farm, often working all day and taking only one 2-week vacation a year. To the extent possible, he assisted with the repair or improvement work on the house. He arranged for the extra labor needed during the harvest and negotiated with hay brokers for the sale of his hay. He conducted his farming operations in a businesslike manner and in accordance with proven methods common to both the area and the crop, and with innovative methods recommended by soil and water conservation organizations. He does not use the farm for recreational purposes. His daughter was required to provide her own farming equipment and to perform *611 maintenance work around the farm and in the barns. ULTIMATE FINDING OF FACT Petitioner had an actual and honest objective of making a profit with respect to his farming and related rental activities in 1976, 1977, and 1978. OPINION Respondent contends that petitioner's activities with respect to his farm were activities "not engaged in for profit" within the meaning of section 183(a). Section 183 provides in part that if an individual's activity is "not engaged in for profit" only those deductions allowable regardless of a profit objective (such as interest or taxes) may be taken. The disputed deductions are allowable, therefore, only if petitioner had an actual and honest profit objective in investing in the farm. Dreicer v. Commissioner,78 T.C. 642 (1982), on appeal (D.C. Cir., June 1, 1982). The taxpayer's expectation of profit need not be a reasonable one, but there must be a good faith objective of making a profit. Sec. 1.183-2(a), Income Tax Regs.; Allen v. Commissioner,72 T.C. 28, 33 (1979). The determination of whether the requisite objective exists is to be resolved on the basis of all the facts and circumstances. Dunn v. Commissioner,70 T.C. 715, 720 (1978), *612 affd. 615 F.2d 578 (2d Cir. 1980). The burden of proof is on petitioner, Golanty v. Commissioner,72 T.C. 411 (1979), affd. in an unpublished opinion 647 F.2d 170 (9th Cir. 1981), with greater weight given to objective facts than to petitioner's mere statement of intent. Sec. 1.183-2(a), Income Tax Regs.; Engdahl v. Commissioner,72 T.C. 659, 666 (1979). The regulations provide a list of factors relevant in determining whether a taxpayer has the requisite profit objective.
No one factor is conclusive, and we do not reach our decision herein by merely counting the factors that support each party's position. Section 1.183-2(b), Income Tax Regs.; Dunn v. Commissioner,supra at 720. Certain factors are given more weight than others because they are more meaningfully applied to the evidence in this case. Our analysis of the factors applicable to petitioner's farming operation is as follows: Manner In Which The Taxpayer Carries On The Activity
Sec. 1.183-2(b)(1), Income Tax Regs., provides: The fact that the taxpayer carries on the activity in a businesslike manner and maintains complete and accurate *613 books and records may indicate that the activity is engaged in for profit. Similarly, where an activity is carried on in a manner substantially similar to other activities of the same nature which are profitable, a profit motive may be indicated. A change of operating methods, adoption of new techniques or abandonment of unprofitable methods in a manner consistent with an intent to improve profitability may also indicate a profit motive. Petitioner conducted himself in a businesslike manner by maintaining detailed books and records, determining the nature of the problems on his farm and undertaking remedial measures, implementing new recommended farming techniques, and acquiring the additional acreage necessary to increase his chances of earning a profit by his farming activities. Petitioner raised crops that were raised by the vast majority of the farmers in the area and utilized the methods employed by successful hay farmers. Although petitioner maintained a single checking account for the farm and his personal use, the farming activities were posted to a separate ledger maintained solely for the farm operation. See Engdahl v. Commissioner,supra at 667. *614 The manner in which petitioner conducted his farming activities is consistent with a profit objective. The Expertise Of The Taxpayer Or His Advisors
Sec. 1.183-2(b)(2), Income Tax Regs., provides: Preparation for the activity by extensive study of its accepted business, economic, and scientific practices, or consultation with those who are expert therein, may indicate that the taxpayer has a profit motive where the taxpayer carries on the activity in accordance with such practices. * * * Petitioner grew up working on a hay farm and has lived in a farm community for practically his entire life. He observed farming practices in the area and read materials circulated by various farm, agriculture, and conservation organizations. Petitioner had extensive experience working with machines, and this experience undoubtedly was helpful in his farming activities. We do not think petitioner's failure to obtain formal farming education indicates a lack of profit objective. The Time And Effort Expended By The Taxpayer In Carrying On The Activity
Sec. 1.183-2(b)(3), Income Tax Regs., provides: The fact that the taxpayer devotes much of his personal time and effort to carrying *615 on an activity, particularly if the activity does not have substantial personal or recreational aspects, may indicate an intention to derive a profit. A taxpayer's withdrawal from another occupation to devote most of his energies to the activity may also be evidence that the activity is engaged in for profit. * * * While petitioner was still president of Advanced Screw Products, he spent as much as 8 to 10 hours a day during the haying season on the farm harvesting the hay.During the off-season, petitioner was often there clearing land and performing maintenance work in order to improve the property. In 1977, petitioner sold his other business and became a full-time farmer. He took only one 2-week vacation a year. We believe the time and effort devoted to his farming activities evidenced the sincerity of petitioner's profit objective. The Success Of The Taxpayer In Carrying On Other Similar Or Dissimilar Activities
Sec. 1.183-2(b)(5), Income Tax Regs., provides: The fact that the taxpayer has egaged in similar activities in the past and converted them from unprofitable to profitable enterprises may indicate that he is engaged in the present activity for profit, even *616 though the activity is presently unprofitable. Petitioner's only previous farming experience was as a child working for his father. Petitioner did, however, start his own business and turned it into a relatively large and profitable enterprise. Petitioner has shown diligence, initiative, foresight, and other qualifies that generally lead to success in other business activities, and he had reason to expect eventual success with this one. The Taxpayer's History of Income Or Losses With Respect To The Activity
Sec. 1.183-2(b)(6), Income Tax Regs., provides: A series of losses during the initial or startup stage of an activity may not necessarily be an indication that the activity is not engaged in for profit. However, where losses continue to be sustained beyond the period which customarily is necessary to bring the operation to profitable status such continued losses, if not explainable, as due to customary business risks or reverses, may be indicative that the activity is not being engaged in for profit. If losses are sustained because of unforeseen or fortuitous circumstances which are beyond the control of the taxpayer, such as drought, disease, fire, theft, weather *617 damages, other involuntary conversions, or depressed market conditions, such losses would not be an indication that the activity is not engaged in for profit. * * * Petitioner has sustained several years of losses relative to his farming activities. (Of course, section 183 cases do not arise with respect to years when an activity is operating at a profit. A period of uninterrupted losses is apparently the triggering condition toi a section 183 controversy.) But, "[i]f losses, or even repeated losses, were the only criterion by which farming is to be judged a business, then a large proportion of the farmers of the country would be outside the pale." Riker v. Commissioner,6 B.T.A. 890, 893 (1927).[5] In Engdahl v. Commissioner,supra, taxpayers were allowed a deduction despite 10 straight years of losses in their horse-breeding operations. Similarly, in Allen v. Commissioner,supra, deductions were allowed in the face of 8 consecutive years of losses. Continued losses weaken a taxpayer's position if they occur over an extended period of *618 time and cannot be adequately explained by the taxpayer. Allen v. Commissioner,supra at 34.Here, petitioner experienced severe unforeseeable weather conditions over several years that greatly inhibited his ability to make a profit. In addition, petitioner initially intended to lease the farm to others and had already leased a portion of his tillable acres when he discovered that he was going to have to farm the land himself. [6] Petitioner thus did not have enough tillable acres available to support his early expenses, except perhaps in the best of circumstances. He therefore acquired 100 additional acres near his farm in order to have enough tillable acres to justify his expenditures for farming equipment. Petitioner attempted various corrective measures to make his land more productive, and we do not think his failure to actually achieve a profit is due to lack of a profit objective. The Financial *619 Status Of The Taxpayer
Sec. 1.183-2(b)(8), Income Tax Regs., provides: The fact that the taxpayer does not have substantial income or capital from sources other than the activity may indicate that an activity is engaged in for profit. Substantial income from sources other than the activity (particularly if the losses from the activity generate substantial tax benefits) may indicate that the activity is not engaged in for profit especially if there are personal or recreational elements involved. Although it is true that petitioner did have substantial income from other sources that enabled him to incur losses from his farming activities and still support himself and his wife, petitioner was not so wealthy that he could afford the kind of expenditures and losses he was incurring without a concomitant anticipation of ultimate profits. Petitioner's substantial income stream was due to expire in 1987. The fact that petitioner had other income sufficient to support his losses during the startup years of his farming activities is consistent with prudent planning and does not negate his profit objective in this case. Elements Of Personal Pleasure Or Recreation
Sec. 1.183-2(b)(9), *620 Income Tax Regs., provides: The presence of personal motives in carrying on of an activity may indicate that the activity is not engaged in for profit, especially where there are recreational or personal elements involved. * * * There were no recreational facilities on the subject land. Respondent argues that the farm held great sentimental appeal for petitioner because it was his childhood home, and that petitioner derived much satisfaction from being able to provide his daughter and grandchildren with a relatively inexpensive place to live. We believe that such personal considerations were incidental and not motivational.Petitioner may have rekindled memories when he was present on his farm, but we do not think his objectives in purchasing the farm were either to return to the home of his yough [7] or to benefit one of his three daughters. Factors Not Significant In This Case
The factor provided by sec. 1.183-2(b)(4), Income *621 Tax Regs., the expectation that assets used in the activity may appreciate in value, is not significant here in light of the stipulation of the parties. See footnote 3, supra. The factor provided in sec. 1.183-2(b)(7), Income Tax Regs., the amount of occasional profits, if any, which are earned, tends to support respondent's determination. This is the only factor resolved in respondent's favor, however, and we do not think petitioner's expenditures in relation to his losses are so extravagant as to outweigh the other factors. In conclusion, we find that the facts here support petitioner's claim that he maintained the requisite profit objective during the years in issue. In so holding, we do not intend to give petitionera "blank check" for the future; at some point, if the losses continue unabated, petitioner's persistance could be deemed foolhardy, and might justify a conclusion that he abandoned any possible profit motive. [8] Because of a concession prior to trial, Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue.↩
2. "Scottsville" is petitioners' mailing address.↩
3. The parties have so stipulated.↩
4. The parties did not submit any information regarding income for 1973 or 1974.↩
*. Standing crop sold at a fixed price per acre; no determination of tonnage or price per acre may be established. ** Includes six acres previously rented to petitioner's daughter.↩
5. See also Fields v. Commissioner,T.C. Memo. 1981-550↩.
6. Respondent has argued that we should consider the rental activities separate from the farming activities. Based upon review of the entire record, we find that there is no real basis for segregating the activities and the expenses relating to each.↩
7. Petitioner no doubt remembered well his father's loss of the farm due to economic reversals, and we think a more likely inference is that he would have been reluctant to purchase it without a sincere belief in its ultimate profitability.↩
8. See Fields v. Commissioner,T.C. Memo. 1981-550↩.