T.C. Summary Opinion 2016-88

UNITED STATES TAX COURT

TAO LONG, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 1533-15S.                          Filed December 20, 2016.

Tao Long, pro se.

<u>Daniel J. Bryant</u>, for respondent.

SUMMARY OPINION

PANUTHOS, <u>Chief Special Trial Judge</u>:  This case was heard pursuant to

the provisions of section 7463 of the Internal Revenue Code in effect when the

petition was filed.[1]  Pursuant to section 7463(b), the decision to be entered is not

_____

[1]Unless otherwise indicated, subsequent section references are to the

(continued...)

reviewable by any other court, and this opinion shall not be treated as precedent for any other case.

Respondent determined Federal income tax deficiencies and accuracy-related penalties as follows:

| Year | Deficiency | Penalty sec. 6662(a) |
|------|-----------|----------------------|
| 2010 | $44,200 | $8,840 |
| 2011 | 31,531 | 6,306 |

After concessions,[2] the issues for decision are: (1) whether petitioner was engaged in a real estate trade or business activity which would entitle him to related deductions claimed on Schedules C, Profit or Loss From Business, for the years in issue; (2) whether petitioner is entitled to deductions for education expenses for his master of business administration (M.B.A.) degree for the years in

---

[1](...continued)
Internal Revenue Code (Code) in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[2]For 2010 the total deficiency and penalty that respondent determined, $53,040, is greater than $50,000. Sec. 7463 provides that at the option of the taxpayer, concurred in by the Tax Court, a case may be heard pursuant to sec. 7463 where the amount of the deficiency placed in dispute does not exceed $50,000. The amount of a deficiency in dispute includes additions to tax and penalties. Sec. 7463(e). Petitioner confirmed at trial that he was not disputing any amount in excess of $50,000. Accordingly, this matter qualifies for consideration under sec. 7463. See Kallich v. Commissioner, 89 T.C. 676, 681 (1987).

issue; and (3) whether petitioner is liable for accuracy-related penalties under section 6662(a) for the years in issue.

Background

Some of the facts have been stipulated, and we incorporate the stipulation of facts by this reference. Petitioner resided in California when the petition was timely filed.

I.    Education and Professional History

Petitioner holds a bachelor of science degree in electrical engineering from the California Institute of Technology and a master of science degree in electrical engineering from the University of Illinois, Urbana-Champaign.

From March 2005 to May 2011 petitioner worked for Broadcom Corp. (Broadcom), starting as a design engineer. In July 2007 petitioner was promoted to the position of product marketing manager and transferred to the product marketing department. Petitioner received additional promotions in the product marketing department at Broadcom, first to the position of senior product marketing manager and then to the position of product line manager.

Broadcom is a semiconductor company in Silicon Valley that makes computer chips. During the relevant years petitioner's responsibilities in the product marketing department included market, product, and trend analysis,

creating proposals about products for upper management that included financial analysis, and managing teams that developed and introduced products to the market. Petitioner also evaluated potential mergers and acquisitions, focusing on financial analysis and time-to-market assessment. Petitioner's work schedule at Broadcom was fairly flexible; except for meetings that had to be attended in person, much of his work could be performed on the smartphone or the laptop that Broadcom provided.

Petitioner resigned from his position at Broadcom in May 2011 immediately before starting a full-time summer internship in the investment division of Barclays Capital, an investment bank. Petitioner worked for Barclays Capital from June through August 2011.

Petitioner did not work again until January 2012 when he began working at Connective Capital Management, LLC (Connective Capital), as a senior research analyst in nearby Palo Alto, California. The job posting under which petitioner applied states that the senior research analyst would "lead research activities in technology and industrial sectors, with responsibility for all aspects including idea generation, technology/product review, business model and competitive analysis, primary research utilizing Connective's industry network, valuation modeling, and risk management." Requirements listed for the senior investment analyst position

include technology-related industry experience, "excellent understanding of product & business fundamentals in target sub-sectors", a financial and/or engineering background, and "[t]echnical undergraduate and MBA from top university preferred." Connective Capital accepted applications for this job posting from September 30 through October 30, 2011.

Petitioner enrolled in the M.B.A. program at the Wharton School, University of Pennsylvania (Wharton M.B.A. program) in May 2010 and graduated with honors in April 2012.[3] Petitioner's coursework for the Wharton M.B.A. program was finance and management-related; he took courses such as financial accounting, new product management, and corporate valuation. Petitioner did not take any real estate courses as part of the Wharton M.B.A. program.

While the Wharton M.B.A. program's main campus is in Philadelphia, Pennsylvania, students could elect to take courses at a campus in San Francisco. Petitioner took courses in San Francisco for five out of the six semesters.

_____

[3]Petitioner was enrolled in and successfully completed six semesters of the Wharton M.B.A. program: summer 2010 (May through August), fall 2010 (September 16 through December 18), spring 2011 (January 7 through April 16), summer 2011 (April through August), fall 2011 (August 26 through December 17), and spring 2012. Petitioner graduated with a cumulative grade point average of 3.76, and his lowest grade was a sole "B" earned in spring 2011; he earned a "B+" or higher in the rest of his graded courses and a "pass" for his two pass/fail courses.

Petitioner elected to spend the fall 2011 semester in Philadelphia. Petitioner had left his job at Broadcom in May 2011 and completed the internship at Barclays Capital in August 2011.

Petitioner's classes at the San Francisco campus were scheduled mainly for Fridays and Saturdays and occasionally for Thursdays. At the time petitioner was living in Mountain View, California, which is approximately 40 miles from San Francisco. If petitioner had classes on Friday and Saturday, the program required that he stay overnight in San Francisco; when this occurred the school arranged a room for the overnight stay. Some of petitioner's courses required homework assignments or group projects, and he would meet with group members for projects via conference call.

The Wharton M.B.A. program required as part of admission an acknowledgment from a student's employer that the student would be permitted adequate time to commit to the program. Petitioner's manager and his supervisor at Broadcom responded to this time commitment, and he was given a lighter workload to allow him more time to focus on his studies. Petitioner continued to receive a full salary from Broadcom while attending his M.B.A. classes.

During the years in issue Broadcom had an educational assistance policy providing financial reimbursement, up to $5,250 per employee per calendar year,

for tuition, fees, books, supplies, and equipment. To be eligible for reimbursement an employee had to be active (not on an unpaid leave of absence), working full time, and have preapproval of each course and his participation from his "first and second-level managers, Human Resources Business Partners and Business Unit Optional Controller" before starting the course(s). Reimbursement had to be "within the budgetary restraints of the employee's cost center", and the employee's enrollment in the course(s) could not be disruptive to his responsibilities or Broadcom's business. Eligible courses had to be taken from an accredited institution of learning, related to the employee's current or potential future job (a determination made at Broadcom's discretion), and completed with a minimum grade of "B-" or "pass". Employees had to request the reimbursement within 60 days after the completion of the course. An employee who terminated his employment within one year of receiving reimbursement was required to repay the reimbursement in full at the time of termination.

Petitioner did not seek or receive reimbursement from Broadcom for the costs of his M.B.A. program during the years in issue. Petitioner was not eligible for reimbursement for any educational costs as an intern for Barclays Capital.

Petitioner passed levels I, II, and III of the Chartered Financial Analyst (CFA) Institute exam in December 2007, June 2008, and June 2009, respectively.

Passing these levels demonstrates knowledge and comprehension of investment tools such as qualitative methods and financial reporting and analysis, analysis/valuation of asset classes including equity and fixed income investments, and portfolio management and wealth planning challenges. According to the CFA Institute, successful candidates report spending an average of 300 hours preparing for each exam level. Petitioner was awarded his CFA charter in October 2012.

Petitioner also passed levels I and II of the Chartered Alternative Investment Analyst (CAIA) Association exam in September 2009 and March 2010, respectively. The CAIA curriculum teaches candidates about investment products and trading strategies for alternative investments including real estate, hedge funds, commodities and managed futures, private equity, and credit derivatives. The CAIA charter is the "[d]esignation for alternative investment professionals" and is the "global mark of distinction in alternative investments." Petitioner received the CAIA designation and became a CAIA member in 2012.

II.     Real Estate and Other Activities

On November 7, 2009, petitioner was issued a real estate broker's license by the State of California Bureau of Real Estate. With this license petitioner could engage in a variety of real estate related transactions, including loan brokerage activities.

Petitioner signed agreements to represent four real estate clients during the years in issue. Petitioner provided copies of four "Buyer Broker Agreement-Exclusive" agreements, signed by himself as broker and signed and initialed by his four clients. Petitioner used the California Association of Realtors (CAR) template for these agreements, which provided him with the exclusive right to represent the client(s) in acquiring real property. Petitioner also provided copies of documents titled "Buyer Services Offer" prepared for the same four clients which included marketing materials for petitioner as a real estate broker, information about the real estate market, and listings of homes available for sale.

Petitioner did not generate any income from his real estate activity during the years in issue or in any year before or after 2010 or 2011. Petitioner did not represent any buyer or seller in a real estate transaction, make any written offers on behalf of clients, or offer any houses for sale as a seller's agent during 2010 or 2011. He also did not hire any employees for his real estate activity.

Petitioner did not claim to have or provide a business plan or formal ledgers or books relating to his real estate activity. Petitioner did not have a business bank account or credit card. Instead he charged expenses for the real estate activity to his personal credit cards and bank accounts. Petitioner kept a handwritten log and

a calendar with handwritten notes which he used to keep track of appointments, trips, and miles driven for the real estate activity.

In June 2007 petitioner purchased a residential townhouse in Sunnyvale, California (Sunnyvale townhouse), which he sold to Lan-Chih Wang in October 2007.[4]  Petitioner signed a lease agreement with Jiayu Wang[5] to rent the first floor and share the second floor of the Sunnyvale townhouse's three floors.  Petitioner provided a copy of a lease agreement signed December 14, 2009, in which he agreed to lease the Sunnyvale townhouse from January 1 through December 31, 2010.

Petitioner lived in Mountain View, California, during the years in issue. Lan-Chih Wang used petitioner's Mountain View home address as her address on some of her tax documents for 2010 and 2011.[6]  Lan-Chih Wang also used the

---

[4]It is unclear from the record whether petitioner ever lived in the Sunnyvale townhouse.

[5]The lease for the Sunnyvale townhouse reflected Jiayu Wang as the lessor. It is unclear why the lease agreement was with Jiayu Wang or whether Lan-Chih Wang still owned the Sunnyvale townhouse during the years in issue.

[6]For 2010 and 2011 the Mountain View address was used on many of Lan-Chih Wang's tax documents, including Form 1099-DIV, Dividends and Distributions, and Form 1099-MISC, Miscellaneous Income.  Petitioner has not provided an explanation for why Lan-Chih Wang used his home address for her tax documents.

Sunnyvale townhouse address on her other tax documents for tax years 2010 and 2011.[7]

On December 1, 2009, petitioner signed an agreement with Info Loan, a residential mortgage broker, which stated he would receive an 80% commission split on loans he originated with the broker.[8] The purpose of the agreement was to permit petitioner to assist potential clients with mortgage loans. The agreement provided that petitioner would split any commission with Info Loan. Petitioner did not generate any commissions pursuant to this agreement and did not generate any commissions from loans or mortgage loans that he brokered before, during, or after the years in issue.

Petitioner also developed a mortgage shuttle service concept during the years in issue. The Power point presentation titled "Mortgage Shuttle" purported to reduce the cost of applying for a mortgage by connecting loan brokers with batches of applications from similar mortgage applicants. Petitioner did not offer this mortgage shuttle service to any clients.

---

[7]For 2010 and 2011 the Sunnyvale townhouse address was used on the rest of Lan-Chih Wang's tax documents (those that did not list petitioner's Mountain View home address), including her Form W-2, Wage and Tax Statement.

[8]The agreement was dated November 25, 2009, but petitioner's signature was dated December 1, 2009.

In 2006 petitioner formed an investment club partnership called Magick Investment Club with two other partners. Petitioner was a general partner of Magick Investment Club and was responsible for managing the funds, and his duties included stock selection and portfolio analysis. The intention of the partnership was for petitioner to earn income from the fund by earning a percentage of the income generated on the basis of the capital contributed. Petitioner did not receive fees for managing the fund or any other income from the partnership in 2010 or 2011.

III. Tax Return

Petitioner prepared and filed his amended 2010 Federal income tax return[9] and timely prepared and filed his 2011 Federal income tax return, attaching Schedules C to his Forms 1040, U.S. Individual Income Tax Return. Petitioner reported salary income of $527,860 and $117,888 for 2010 and 2011, respectively. Petitioner claimed deductions for two types of expenses on his Schedules C during the years in issue: (1) deductions for expenses relating to his real estate activity and (2) deductions for tuition expenses for attending the Wharton M.B.A. program, listed under other expenses as "Continuing Education". Petitioner claimed deductions for expenses relating to his real estate activity totaling

---

[9]Petitioner's original 2010 Form 1040 was not made part of the record.

$103,760 and $52,367 for 2010 and 2011, respectively.  After concessions the deductions relating to the real estate activity still in dispute are as follows:[10]

| Expense | 2010 | 2011 |
| --- | --- | --- |
| Other (promotional) | $1,000 | --- |
| Other (tax return software) | 115 | $115 |
| Utilities | 2,093 | 930 |
| Travel | 8,687 | 1,285 |
| Taxes and licenses | 295 | 260 |
| Supplies | 923 | 227 |
| Repairs and maintenance | 950 | 650 |
| Rent and lease--other business property | 18,900 | 21,280 |
| Rent and lease--vehicles, machinery, and equipment | 5,607 | 4,856 |
| Office | 950 | --- |
| Legal and professional fees | 2,531 | 757 |
| Insurance other than health | 1,008 | --- |
| Depreciation and sec. 179 | 18,042 | --- |
| Contract labor | 2,400 | 2,760 |
| Car and truck | 3,097 | 3,211 |
| Advertising | 2,750 | 300 |
| Meals and entertainment | 4,912 | 688 |
| Total | 74,260 | 37,319 |

Petitioner also seeks $4,250 in deductions for depreciation and section 179 expenses for 2011 which were not claimed on the return.  Petitioner provided

---

[10]Petitioner made concessions in his posttrial memorandum.

copies of receipts for these items which included a Bluetooth headset, two solid state drives, a memory card, an iPad and an iPad cover, a scanner, an iPhone, a Kindle Touch, and a Kindle Fire.

Petitioner did not file a Schedule C for his real estate activity for tax years before 2010 and has not filed a Schedule C for any tax year since 2011.

The parties agree that petitioner substantiated $86,100 and $84,450 paid to Wharton for tuition, fees, books, supplies, and room and board for tax years 2010 and 2011, respectively.[11]

## Discussion

### I.    Burden of Proof

In general, the Commissioner's determination set forth in a notice of deficiency is presumed correct, and the taxpayer bears the burden of proving that

---

[11]Petitioner claimed deductions for expenses for the Wharton M.B.A. program of $57,400 for 2010 and $74,139 for 2011.  At trial petitioner claimed there were errors in his initial calculation of costs, and he provided as evidence a copy of a Form 1098-T, Tuition Statement, from Wharton reflecting $84,450 billed for qualified expenses in 2011 and copies of invoices from Wharton for fees paid for the summer 2010, fall 2010, spring 2011, and fall 2011 semesters.  The copies of Charles Schwab bank statements petitioner provided for the relevant years also reflect corresponding payments to the University of Pennsylvania (Wharton) for the summer 2010, fall 2010, spring 2011, and summer 2011 semesters.  In addition, petitioner provided copies of his transcripts for 2010 through 2012 and syllabi for many of his courses.  Respondent agreed at trial that amounts paid for the Wharton M.B.A. were $86,100 for 2010 and $84,450 for 2011.

the determination is in error.  Rule 142(a); <u>Welch v. Helvering</u>, 290 U.S. 111, 115 (1933).  Pursuant to section 7491(a), the burden of proof as to factual matters shifts to the Commissioner under certain circumstances.  Petitioner did not allege or otherwise show that section 7491(a) applies.  <u>See</u> sec. 7491(a)(2)(A) and (B).  Therefore, petitioner bears the burden of proof.  <u>See</u> Rule 142(a).

II.    <u>Real Estate Activity</u>

Deductions are allowed solely as a matter of legislative grace.  <u>Deputy v. du Pont</u>, 308 U.S. 488, 493 (1940); <u>New Colonial Ice Co. v. Helvering</u>, 292 U.S. 435, 440 (1934).  A taxpayer bears the burden of proving entitlement to any deduction claimed.  <u>See</u> Rule 142(a); <u>INDOPCO, Inc. v. Commissioner</u>, 503 U.S. 79, 84 (1992); <u>Welch v. Helvering</u>, 290 U.S. at 115.

Section 162(a) generally allows deductions for all ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business.  A taxpayer seeking to deduct trade or business expenses under section 162 must establish that the underlying activity was engaged in with an actual and honest profit objective.  <u>Dreicer v. Commissioner</u>, 78 T.C. 642, 645 (1982), <u>aff'd without published opinion</u>, 702 F.2d 1205 (D.C. Cir. 1983).  The taxpayer must have entered into or continued the activity with the actual, honest, and bona fide objective of making a profit.  <u>Filios v. Commissioner</u>, 224 F.3d 16, 23 (1st Cir.

2000), aff'g T.C. Memo. 1999-92; Dreicer v. Commissioner, 78 T.C. at 644-645; sec. 1.183-2(a), Income Tax Regs.  Profit means economic profit, independent of tax savings.  Surloff v. Commissioner, 81 T.C. 210, 233 (1983).  We consider all of the facts and circumstances in determining whether a taxpayer entered into the activity for a profit, placing greater weight upon objective facts than the taxpayer's statements of intent.  Dreicer v. Commissioner, 78 T.C. at 645.

The following nine nonexclusive factors are relevant in determining whether the taxpayer engaged in the activity for profit:  (1) the manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) the elements of personal pleasure or recreation.  Sec. 1.183-2(b), Income Tax Regs.

No factor or group of factors is controlling, nor is it necessary that a majority of factors point to one outcome.  See Keating v. Commissioner, 544 F.3d 900, 904 (8th Cir. 2008), aff'g T.C. Memo. 2007-309; Engdahl v. Commissioner,

72 T.C. 659, 666 (1979); sec. 1.183-2(b), Income Tax Regs. Certain factors may be accorded more weight in a particular case because they are more meaningful as applied to its facts. See Pouemi v. Commissioner, T.C. Memo. 2015-161, at *8, aff'd, 633 F. App'x 186 (4th Cir. 2016); Vitale v. Commissioner, T.C. Memo. 1999-131, slip op. at 18, aff'd without published opinion, 217 F.3d 843 (4th Cir. 2000); Green v. Commissioner, T.C. Memo. 1989-436, 57 T.C.M. (CCH) 1333, 1343 (1989) (noting that all nine factors do not necessarily apply in every case).

If an activity is not engaged in for profit, a taxpayer is limited to deducting related expenses only to the extent that he generated gross income from the activity. Sec. 183(a) and (b). We look to the factors referred to above to decide whether the real estate activity was engaged in for profit.

A.    Manner in Which the Taxpayer Carries On the Activity

A taxpayer's carrying on the activity in a businesslike manner and maintaining complete and accurate books and records may indicate that the activity is engaged in for profit. Engdahl v. Commissioner, 72 T.C. at 666; sec. 1.183-2(b)(1), Income Tax Regs. A change of operating methods, adoption of new techniques, or abandonment of unprofitable methods in a manner consistent with an intent to improve profitability may also indicate a profit motive. Sec. 1.183-2(b)(1), Income Tax Regs. When determining whether the taxpayer kept

adequate books and records, the Court considers such factors as whether the taxpayer has formal ledgers or books, a business plan, or a business bank account. Pouemi v. Commissioner, at *4.

An important indication of whether an activity is being performed in a businesslike manner is whether the taxpayer implements some method for controlling expenses and methods to control those losses. A taxpayer's failure to use any records kept to reduce expenses, increase profits, and evaluate overall performance indicates that the activity was not engaged in for profit. Smith v. Commissioner, 182 F.3d 927, 1999 WL 273314, at *2 (9th Cir. 1999), aff'g T.C. Memo. 1997-503; Golanty v. Commissioner, 72 T.C. 411, 430 (1979), aff'd, 647 F.2d 170 (9th Cir. 1981).

Petitioner did not maintain complete and accurate books and records. Petitioner has not asserted he had a business plan or an accounting system for his business, and his recordkeeping was incomplete and disorganized. To substantiate expenses petitioner provided minimal receipts (some of them incomplete), credit card summaries with handwritten notes, and bank statements from his personal bank account. Petitioner's handwritten logs often have dates out of order and minimal notes. In his memorandum petitioner sought to substantiate some expenses by referencing personal logs and receipts that he did not provide.

Petitioner did not have a business bank account or credit card for his real estate activity. See Pouemi v. Commissioner, at *4; sec. 1.183-2(b)(1), Income Tax Regs.

Petitioner did not conduct his activity in a businesslike manner or have a plan to reduce expenses or control losses. Petitioner seeks to deduct substantial expenses for his real estate activity for the years in issue, but the real estate activity did not generate income. For example, petitioner failed to explain the business purpose for spending over $18,000 per year on renting the Sunnyvale townhouse. See Smith v. Commissioner, 1999 WL 273314, at *2; Golanty v. Commissioner, 72 T.C. at 430.

Further, despite not having generated any income for either of the years in issue, petitioner spent over $4,000 on electronic equipment in 2011, with the bulk of the expenses incurred in November and December.[12] Petitioner was living and studying in Philadelphia during fall 2011 and was presumably spending less time on his real estate activity. Petitioner did not continue his real estate activity after 2011. See Smith v. Commissioner, 1999 WL 273314, at *2; Golanty v. Commissioner, 72 T.C. at 430.

---

[12]Of the items totaling $4,250 that petitioner seeks to claim as additional deductions for depreciation expenses for 2011, he spent $2,511 in November and December on an iPhone, an iPhone car charger, a Kindle touch, a Kindle Fire, and one solid state drive.

On the basis of this record this factor does not support petitioner's claim of a profit objective. See sec. 1.183-2(b)(1), Income Tax Regs.

B.      Expertise of the Taxpayer or His Advisors

Preparation for an activity by extensive study of its accepted business and economic practices or consultation with experts may indicate that the taxpayer has a profit motive where the taxpayer carries on the activity in accordance with those practices. Id. subpara. (2).

Petitioner studied for the California exam for real estate brokers and was issued a real estate broker's license on November 7, 2009. Thus, petitioner put in time and effort to study for the real estate exam to become licensed in the field. Petitioner also used the CAR template for his buyer broker agreements with clients, demonstrating that he knew some of the practices of a broker. Additionally, petitioner spent time researching the residential real estate market in Mountain View and the surrounding areas and presented this research to clients.

On the basis of these facts we are satisfied that this factor supports petitioner's claim of profit motive. See id.

C.    Time and Effort Expended by the Taxpayer

A taxpayer devoting "much of his personal time and effort to carrying on the activity" may indicate profit intent, particularly if the activity does not have substantial personal or recreational aspects.  See id. subpara. (3).

Petitioner asserts that he spent "an equal amount of time, if not more" on his real estate activity than on his full-time job.  Petitioner asserts that he accomplished this by working after hours and on weekends and by managing his time efficiently.  In addition to the four clients that he signed agreements with, petitioner asserts that he also had oral commitments with "a number of clients."  Reviewing petitioner's handwritten logs, we found the names of three people that might have been clients.  Petitioner had notes for approximately 27 dates in 2010 and approximately 54 dates in 2011 when he was meeting with clients, viewing houses, researching markets, meeting with investors, or attending Info Loan training.  Some of the notes merely reflected a meeting with investors or a research trip, and the notes usually did not indicate how much time was spent on an endeavor.

Petitioner was working full time for Broadcom for the first year and a half of the years in issue, then as a full-time intern for Barclays Capital in summer 2011.  Petitioner was also enrolled full time in the Wharton M.B.A. program from

May 2010 through the end of 2011 and graduated with honors. Petitioner asserts that his supervisors at Broadcom reduced his workload to accommodate his M.B.A. studies and his work hours were flexible, but we presume he still had a significant level of responsibility and duties since he was paid for full-time work. From September through December 2011 petitioner was residing in Philadelphia and attending the Wharton M.B.A. program full time.

We conclude that petitioner's claim that he spent as much time on his real estate activity as on his full-time job is likely exaggerated. Considering the demands on petitioner's time created by full-time employment with Broadcom in a management position, as well as his M.B.A. studies in which he excelled, we are not convinced that he devoted full-time hours to his real estate activity. On the basis of this record petitioner's time devoted to his real estate activity was part time at most, and we are not satisfied that he spent sufficient time and effort to indicate an intent to profit. This factor is negative. See sec. 1.183-2(b)(3), Income Tax Regs.

D.    Expectation Assets Used in Activity May Appreciate

An expectation that the assets used in the activity may appreciate is an indication of a profit motive. Id. subpara. (4). The term "profit" encompasses appreciation of assets, such as land, used in the activity. Id.

Petitioner did not acquire any assets that might appreciate as part of his real estate activity during the years in issue; petitioner's expenditures for the years in issue were mostly for rent and services. Petitioner acquired only depreciable assets such as a refrigerator and a scanner. This factor is neutral. See id.

E.     Success in Carrying On Similar or Dissimilar Activities

Although an activity is unprofitable, the fact that a taxpayer has previously converted similar activities from unprofitable to profitable enterprises may be an indication of a profit motive with respect to the current activity. Id. subpara. (5). Success in unrelated activities may also indicate a profit objective in the challenged activity. See Daugherty v. Commissioner, T.C. Memo. 1983-188, 45 T.C.M. (CCH) 1224, 1228 (1983); sec. 1.183-2(b)(5), Income Tax Regs.

Looking at his other financial endeavors, petitioner claims that Magick Investment Club was successful over the years. Petitioner did not report any income from this partnership for 2010 or 2011. Thus there is insufficient evidence that petitioner's other financial endeavors outside of his salaried work were successful, and this factor is neutral. See Daugherty v. Commissioner, T.C. Memo. 1983-188, 45 T.C.M. (CCH) 1224, 1228 (1983); sec. 1.183-2(b)(5), Income Tax Regs.

F.      History of Income or Losses

A series of losses during the initial stage of an activity may not necessarily

be an indication that the activity is not engaged in for profit.  Sec. 1.183-2(b)(6),

Income Tax Regs.  Losses continuing beyond the period customarily required to

make an activity profitable, if not explainable, may indicate that the activity is not

engaged in for profit.  See id.

Petitioner was engaged in the real estate activity for approximately two

years.  Petitioner claims that he did not generate any commissions or other income

from his real estate activity because the real estate market had not sufficiently

recovered from the economic recession.  Petitioner also claims that because of the

depressed real estate market he could not secure investor funding for his mortgage

shuttle concept.  Given the short period we have to evaluate and the state of the

market, we conclude this factor is at best neutral.  See id.

G.      Amount of Occasional Profits

The amount of profits in relation to the amount of losses incurred may

provide useful criteria in determining the taxpayer's intent.  Id. subpara. (7).  An

occasional small profit from an activity generating large losses is not generally

determinative that the activity is engaged in for profit.  Id.  If the activity is

"highly speculative", the opportunity to earn a "substantial ultimate profit" is

sufficient to indicate that the activity is for profit, even if there are only occasional small profits or no profits are realized. Id. When considering the type of activity, "residential real estate is not a 'highly speculative venture' where losses can be justified by an expectation of large profits." Pouemi v. Commissioner, at *10.

Petitioner did not report any gross receipts or profit, even occasional, from his real estate activity during the years in issue. Instead petitioner reported substantial losses from his real estate activity. Petitioner did not conduct any real estate activity before or after the years in issue, so there are no other years available for comparison. Petitioner's activity was in residential real estate, which is not a 'highly speculative venture' in which his losses could be justified by an expectation of "substantial ultimate profit." Id. Therefore this factor does not support a profit objective. See sec. 1.183-2(b)(7), Income Tax Regs.

H.    Financial Status of the Taxpayer

The fact that the taxpayer does not have substantial income from sources other than the activity may indicate that the activity is engaged in for profit. Id. subpara. (8). Substantial income from other sources may indicate that the activity is not engaged in for profit, especially if there are personal or recreational elements involved. Id. Deriving significant personal tax benefits from an activity,

without other indicators that it is engaged in for profit, indicates that the activity is not engaged in for profit. Pouemi v. Commissioner, at *11.

During all of 2010 and the first half of 2011 petitioner had a full-time position at Broadcom. Petitioner also worked as a full-time intern at Barclays Capital during the summer of 2011. Petitioner's reported income from salary or wages was $527,860 for 2010 and $117,888 for 2011.[13] Petitioner reported zero gross receipts from the real estate activity and thus had substantial income from his full-time positions. We also find that petitioner derived significant personal tax benefit from the real estate activity deductions. Petitioner claimed business loss deductions for his real estate activity of $103,760 and $52,367 for 2010 and 2011, respectively, which significantly offset his salaried income for both years and reduced his taxable income. Thus, this factor does not support a profit objective. See id.; sec. 1.183-2(b)(8), Income Tax Regs.

I. Personal Elements

The presence of personal motives in carrying on an activity may indicate that the activity is not engaged in for profit, especially where there are recreational or personal elements involved. Sec. 1.183-2(b)(9), Income Tax Regs. The fact

---

[13]It is unclear from the record whether petitioner was paid or classified as an employee while working as an intern for Barclays Capital. Thus we do not know whether petitioner's 2011 income includes salary or wage income from this internship.

that the taxpayer derives personal pleasure from engaging in the activity is not sufficient to classify the activity as not for profit if there are other factors indicating that it is for profit. Id.

We are uncertain whether there were some personal elements involved in petitioner's travel, which he asserts was related to his real estate activity. Petitioner's logs list 14 separate trips to Las Vegas, Nevada, Los Angeles, California, and San Diego, California, with little or no explanation. For example, the notes for the Las Vegas trip during the Fourth of July weekend in 2011 state that it was a meeting with investors and do not explain who he met with or the purpose of the trip. These three cities are popular tourist destinations, particularly during holidays.

We are equally uncertain as to the business nature of the rental of the Sunnyvale townhouse, a residential property. Petitioner had previously owned the Sunnyvale townhouse and then sold it to Lan-Chih Wang in 2007. Lan-Chih Wang used petitioner's home address in Mountain View on some of her tax documents during the years in issue. Further, Lan-Chih Wang also may have been living in the Sunnyvale townhouse during the years in issue since she purchased it from petitioner in 2007, petitioner did not rent the entire Sunnyvale townhouse,

and Lan-Chih Wang used the Sunnyvale townhouse address on some of her tax documents (when not using petitioner's home address).

Petitioner asserted that there was "no relationship" with Lan-Chih Wang before or during the years in issue, that he did not "observe" her living at the Sunnyvale townhouse, and that he does not know why Lan-Chih Wang would use his home address for her personal tax documents. We find this testimony somewhat suspect, particularly in the light of the fact that petitioner was highly educated and was very articulate with respect to many of the issues in this case.

Therefore, we find on the basis of this record, that petitioner's real estate activity had personal elements, and since there are no significant other factors indicating that the activity was conducted for profit, this factor does not support a profit objective. See id.

We conclude that the real estate activity was an activity not engaged in for profit. Pursuant to section 183(a) and (b), the deductions attributable to petitioner's real estate activity are limited to the gross income he derived from the activity. Since petitioner did not derive any gross income from this activity during 2010 and 2011, he is not entitled to any of the claimed deductions.[14]

---

[14]Because petitioner is not entitled to deductions for his real estate activity, we do not need to address substantiation.

III.    Education Expenses

A.    General

Petitioner initially claimed deductions for education expenses on his Schedules C, asserting that the education expenses were related to his real estate activity.  Having concluded that petitioner was not engaged in an activity for profit, we consider whether the education expenses are properly deductible as unreimbursed employee expenses.[15]

As a general rule, section 162(a) authorizes a deduction for "ordinary and necessary expenses paid or incurred * * * in carrying on any trade or business".  An individual's expenditures for education are deductible as ordinary and necessary business expenses if the education maintains or improves skills required in his employment or other trade or business.  Sec. 1.162-5(a), Income Tax Regs.

Generally, the performance of services as an employee constitutes a trade or business.  Primuth v. Commissioner, 54 T.C. 374, 377 (1970).  A taxpayer may deduct unreimbursed employee expenses incurred only as miscellaneous itemized deductions on Schedule A, Itemized Deductions, and then only to the extent such expenses exceed 2% of the individual's adjusted gross income.  Secs. 62(a)(2),

---

[15]Petitioner asserted at trial that his M.B.A. studies enhanced the skills he was using in his position at Broadcom and that the company consented to and accommodated his M.B.A. studies.  The Court finds the issue was tried by consent and is properly before us.  See Rule 41(b)(1).

63(a), (d), 67(a) and (b), 162(a). Itemized deductions may be limited under the overall limitations on itemized deductions under section 68 and may have an alternative minimum tax implication under section 56(b)(1)(A)(i).

The regulations disallow any deduction for the following education expenses: (1) those incurred to meet the minimum educational requirement for qualification in a taxpayer's trade or business and (2) those which qualify a taxpayer for a new trade or business. Sec. 1.162-5(b)(2) and (3), Income Tax Regs. Respondent has not questioned whether petitioner's M.B.A. degree was incurred to meet the minimum educational requirement of his trade or business. Thus we consider whether the education qualified petitioner for a new trade or business.

B. Education Qualifying Taxpayer for a New Trade or Business

The Court applies an objective standard as to whether the education qualifies the taxpayer for a new trade, and the relevant inquiry is the level of responsibility before and after the education. Robinson v. Commissioner, 78 T.C. 550, 556-557 (1982). If the education qualifies a taxpayer to perform tasks and activities significantly different from those he could before earning the degree, then the taxpayer has qualified for a new trade or business. Id. at 552; Diaz v. Commissioner, 70 T.C. 1067, 1074 (1978), aff'd without published opinion, 607

F.2d 995 (2d Cir. 1979); see also Glenn v. Commissioner, 62 T.C. 270, 278 (1974) (finding that the taxpayer's law degree qualified him for a new trade or business because he could not practice law before earning the degree).

An education that merely refines taxpayer's existing skills does not qualify him for a new trade or business. Robinson v. Commissioner, 78 T.C. at 557. We have held that a taxpayer may deduct the cost of an M.B.A. degree as an unreimbursed employee expense if his studies improve on preexisting skills such as management skills. Allemeier v. Commissioner, T.C. Memo. 2005-207, slip op. at 13-14; Sherman v. Commissioner, T.C. Memo. 1977-301, 36 T.C.M. (CCH) 1191, 1193-1194 (1977). A taxpayer is in the same trade or business if he is still in the same general field and still using the same skills; for example, moving from one position to another that also uses management, administrative, and planning skills. See Sherman v. Commissioner, 36 T.C.M. (CCH) at 1193-1194.

Respondent contends that the Wharton M.B.A. qualified petitioner for a new trade or business and that it enabled him to acquire the position with Connective Capital. We are satisfied that petitioner was qualified in the same trade or business before enrolling in the M.B.A. program and remained in this trade or business when he became a senior analyst with Connective Capital.

Petitioner was qualified in financial analysis through his studies and personal investment experience before enrolling in the M.B.A. program in May 2010. Petitioner's passing CAIA levels I and II by March 2010 demonstrated his knowledge in alternative investment strategies and products. Petitioner also passed all three levels of the CFA exam by June 2009, spending an estimated 900 hours learning about investment tools and portfolio management to prepare for the exam. Further, petitioner was developing financial investment skills as general partner of the Magick Investment Club partnership, a role he began in 2006 and continued throughout the years in issue. See Robinson v. Commissioner, 78 T.C. at 556-557; Diaz v. Commissioner, 70 T.C. at 1074.

Petitioner also acquired managerial and financial analysis skills through his employment and continued to develop those skills during the years in issue. While working in the product marketing department at Broadcom petitioner gained experience in financial analysis of mergers and acquisitions and financial analysis for product proposals provided to upper management. Petitioner developed managerial skills in his role at Broadcom managing teams that would bring a product to market. Additionally, petitioner gained financial investment experience as an investment intern at Barclays Capital. See Allemeier v. Commissioner, slip op. at 13-14; Sherman v. Commissioner, 36 T.C.M. (CCH) at 1193-1194.

Additionally, the fact that petitioner's superiors at Broadcom agreed to his time commitment for the M.B.A. program and gave him a reduced workload while still paying his full time salary indicates that the company expected to benefit from his studies. We are satisfied that petitioner's management and finance courses in the Wharton M.B.A. program did not qualify him for a new trade or business. Rather, they further developed skills he was already using in his current trade or business. See Allemeier v. Commissioner, slip op. at 13-14; Sherman v. Commissioner, 36 T.C.M. (CCH) at 1193-1194; sec. 1.162-5(b)(3), Income Tax Regs.

Respondent highlighted the job posting for the senior research analyst position with Connective Capital, with the description of M.B.A. preferred, as evidence that the M.B.A. qualified petitioner for a new trade or business. This was stated as a mere preference, and petitioner had other qualifications listed in the job description, including personal and professional investment experience and a technical undergraduate degree. Respondent also emphasized that petitioner did not become a CFA charter holder or a CAIA member until 2012. Petitioner explained that the delay was because the yearly fees were expensive and passing CFA or CAIA exams would be sufficient to demonstrate knowledge and expertise. Petitioner asserted that for these exams the passing rate is "only 40 percent. So

typically regarded as a very difficult exam to pass." We find this explanation reasonable.

We also find that at Connective Capital petitioner was in the same trade or business as in his prior positions, using financial and management skills. For example, when tasked to provide financial analysis petitioner used financial skills he developed at Barclays Capital and Broadcom. Therefore petitioner, working as a senior research analyst, was still in the same trade or business as he was in his prior positions. See Sherman v. Commissioner, 36 T.C.M. (CCH) at 1193-1194.

A taxpayer may be engaged in a trade or business, although not working, if he was previously involved in and actively sought to continue in that trade or business while pursuing a defined degree program related to his or her line of work. Ford v. Commissioner, 56 T.C. 1300, 1304 (1971), aff'd, 487 F.2d 1025 (9th Cir. 1973); Hitt v. Commissioner, T.C. Memo. 1978-66, 37 T.C.M. (CCH) 333, 334-335 (1978); Sherman v. Commissioner, 36 T.C.M. (CCH) at 1193-1194; see also Haft v. Commissioner, 40 T.C. 2 (1963). The taxpayer must clearly intend to seek employment in the same trade or business. Goldenberg v. Commissioner, T.C. Memo. 1993-150, 1993 WL 101367, at *4; see Corbett v. Commissioner, 55 T.C. 884, 887-888 (1971).

During September through December 2011 petitioner was not working for an employer and was taking M.B.A. courses in Philadelphia. Considering his aspirations and work ethic and the fact that he applied for the senior analyst position sometime between September 30 and October 30, he clearly intended to find another position and continue his professional career. See Corbett v. Commissioner, 55 T.C. at 887-888; Goldenberg v. Commissioner, 1993 WL 101367, at *4. These four months were a transition period during which petitioner was actively seeking employment while pursuing a defined graduate degree program. We conclude that petitioner may be considered to have been carrying on his trade or business during this time. See Ford v. Commissioner, 56 T.C. at 1304; Haft v. Commissioner, 40 T.C. at 2; Hitt v. Commissioner, 37 T.C.M. (CCH) at 334-335; Sherman v. Commissioner, 36 T.C.M. (CCH) at 1193-1194.

C.   Unreimbursed Employee Expenses

Because we are satisfied that petitioner's Wharton M.B.A. did not qualify him for a new trade or business, we consider whether he is eligible to deduct his educational expenses as an unreimbursed employee expense.[16]

In order to deduct employee expenses, a taxpayer must not have received reimbursement. Orvis v. Commissioner, 788 F.2d 1406, 1408 (9th Cir. 1986),

---

[16]We note that the issue of entitlement to reimbursement was not raised by respondent. However, we include this discussion for completeness.

aff'g T.C. Memo. 1984-533; Leamy v. Commissioner, 85 T.C. 798, 810 (1985). If a taxpayer cannot provide a valid explanation as to why he voluntarily did not seek reimbursement when he was eligible under his employer's policies, he is precluded from claiming a deduction for an unreimbursed employee expense. Heidt v. Commissioner, 274 F.2d 25, 26 (7th Cir. 1959), aff'g T.C. Memo. 1959-31; Coplon v. Commissioner, T.C. Memo. 1959-34, 18 T.C.M. (CCH) 166, 167 (1959), aff'd, 277 F.2d 534 (6th Cir. 1960). An eligible taxpayer cannot refrain from seeking reimbursement so he can "convert the employer's right to a deduction into a right of his own." Heidt v. Commissioner, 274 F.2d at 28; see also Coplon v. Commissioner, 18 T.C.M. (CCH) at 167.

On the record before us, petitioner appears to have met many of the requirements of Broadcom's educational assistance policy and thus may have been eligible for reimbursement of up to $5,250 per year for his Wharton M.B.A. expenses. Petitioner was an active, full-time employee; the courses were taken from an accredited institution; he met the grade minimum in all his courses; and the courses were related to his current job at Broadcom. Since petitioner's manager and supervisor were willing to acknowledge his time commitment and gave him a lighter workload when he was in the M.B.A. program, it appears the company may not have found his studies to be disruptive.

Petitioner did not seek reimbursement for his Wharton M.B.A. expenses during 2010 or 2011.  Assuming petitioner had taken all the requisite steps before taking his first M.B.A. course, under Broadcom's educational assistance policy he could have sought reimbursement within 60 days after a course was completed.  During his tenure at Broadcom petitioner could have sought reimbursement on only three occasions, within 60 days of the end of each semester in August 2010, December 2010, and April 2011.[17]  Since petitioner terminated his employment in May 2011, less than a year from the periods in which he was eligible for reimbursement, he would have had to immediately repay any reimbursement received from Broadcom the day he resigned.

We conclude that petitioner's decision to not seek reimbursement from Broadcom for his education expenses incurred during January 2010 through June 2011 was reasonable.  Petitioner's education expenses were only temporarily eligible for reimbursement; once he resigned from his position any education expense reimbursement had to be repaid, and these amounts would have converted back to personal expenses.[18]  Petitioner was not merely seeking to convert

---

[17]See supra note 3 for the timeline of petitioner's class schedule at Wharton.

[18]Additionally, petitioner's education expenses, $86,000 in 2010 and $84,450 in 2011, were much greater than Broadcom's educational assistance reimbursement limit of $5,250 per employee per year.  Even if petitioner had

(continued...)

Broadcom's deductible expense to one of his own. Thus the issue of possible reimbursement is not a bar to deductibility of education expenses incurred during January 2010 through August 2011 as unreimbursed employee expenses. See Heidt v. Commissioner, 274 F.2d at 26; Coplon v. Commissioner, 18 T.C.M. (CCH) at 167.

As an intern for Barclays Capital petitioner was not eligible for reimbursement for education expenses. Petitioner was also not eligible for reimbursement for his education expenses during the period September through December 2011. As previously discussed, petitioner was still considered to be an employee during this time. See Ford v. Commissioner, 56 T.C. at 1304; Haft v. Commissioner, 40 T.C. at 6; Hitt v. Commissioner, 37 T.C.M. (CCH) at 334-335; Sherman v. Commissioner, 36 T.C.M. (CCH) at 1193-1194. Thus petitioner is also eligible to deduct unreimbursed employee expenses incurred during the period June through December 2011. See Orvis v. Commissioner, 788 F.2d at 1408; Leamy v. Commissioner, 85 T.C. at 810.

---

[18](...continued)
sought (and did not have to repay) reimbursement, he could have deducted the amounts exceeding $5,250 for each year because that portion was ineligible for reimbursement. See Orvis v. Commissioner, 788 F.2d 1406, 1408 (9th Cir. 1986), aff'g T.C. Memo. 1984-533; Leamy v. Commissioner, 85 T.C. 798, 810 (1985).

For these reasons petitioner can deduct the costs of his Wharton M.B.A. program for 2010 and 2011 as unreimbursed employee expenses. These expenses can be deducted on Schedule A, subject to the applicable limitations discussed supra p. 30. See secs. 62(a)(2), 63(a), (d), 67(a) and (b), 162(a), 68, 56(b)(1)(A)(i).

IV.    Accuracy-Related Penalties

Section 6662(a) and (b)(1) imposes a penalty of 20% of the portion of an underpayment of tax attributable to negligence. "Negligence" includes any failure to make a reasonable attempt to comply with the Code, including any failure to keep adequate books and records. See sec. 6662(c); sec. 1.6662-3(b)(1), Income Tax Regs.

The Commissioner bears the burden of production with respect to a section 6662 penalty. Sec. 7491(c). In order to meet this burden the Commissioner need only make a prima facie case that imposition of the penalty or addition to tax is appropriate. Higbee v. Commissioner, 116 T.C. 438, 445 (2001). Once the Commissioner meets this burden of production, the taxpayer then must come forward with persuasive evidence that the accuracy-related penalty should not be imposed with respect to the underpayment because, for example, the taxpayer

acted with reasonable cause and in good faith. <u>See</u> sec. 6664(c)(1); Rule 142(a); <u>Higbee v. Commissioner</u>, 116 T.C. at 446-447.

The section 6662(a) accuracy-related penalty does not apply with respect to any portion of an underpayment if the taxpayer proves that there was reasonable cause for such portion and that he acted in good faith. Sec. 6664(c)(1). The determination of whether a taxpayer acted with reasonable cause and in good faith depends on the pertinent facts and circumstances, including: (1) the taxpayer's efforts to assess the proper tax liability; (2) the knowledge and the experience of the taxpayer; and (3) any reliance on the advice of a professional such as an accountant. Sec. 1.6664-4(b)(1), Income Tax Regs. Generally, the most important factor is the taxpayer's effort to assess the proper tax liability. <u>Id.</u> An honest misunderstanding of fact or law that is reasonable in the light of the knowledge, experience, and education of the taxpayer may constitute reasonable cause and good faith. <u>Id.</u>

Respondent met his burden of production with respect to the underpayment resulting from disallowed deductions claimed for the real estate activity by producing evidence that petitioner failed to maintain adequate books and records.[19]

---

[19]We have concluded that petitioner is entitled to deductions for his education expenses for 2010 and 2011, even though he mischaracterized the expenses and claimed them on the incorrect form. Accordingly, the negligence

(continued...)

The burden of proof thus shifts to petitioner. See secs. 6664(c)(1), 7491(c); Rule 142(a); Higbee v. Commissioner, 116 T.C. at 446-447.

Petitioner prepared his own returns and has not provided evidence of his efforts to assess the proper tax treatment of his real estate activity, nor has he asserted that he relied on the advice of a professional such as an accountant. Petitioner is a highly educated professional with experience researching complex issues and a background and education in finance and management. Petitioner is a sophisticated taxpayer who understands complex laws in areas such as finance. On the basis of this record we find that petitioner did not prove he acted with reasonable cause and in good faith. See Higbee v. Commissioner, 116 T.C. at 447; sec. 1.6664-4(b)(1), Income Tax Regs. We find that this failure constitutes a failure to try to comply with the Code and the underpayment is due to negligence. See sec. 6662(b)(1), (c); sec. 1.6662-3(b)(1), Income Tax Regs.

Accordingly, we hold that petitioner is liable for the accuracy-related penalty due to negligence under section 6662(a) and (b)(1) for tax years 2010 and 2011.

---

[19](...continued)
penalty is not sustained to the extent we have allowed the claimed education expense deductions.

We have considered all of the parties' arguments, and, to the extent not addressed herein, we conclude that they are moot, irrelevant, or without merit.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>under Rule 155</u>.